## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
## EASTERN DIVISION

MICHELLE BYROM                                             PETITIONER

VS.                               CIVIL ACTION NO.: 1:06CV142-MPM

CHRISTOPHER EPPS, ET AL.                                   RESPONDENTS

### AMENDED MEMORANDUM OPINION AND ORDER[1]

Michelle Byrom is an inmate confined to the Mississippi Department of Corrections who

has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging the

otherwise final capital murder conviction and sentence of death imposed on her by the Circuit

Court of Tishomingo County, Mississippi, for her involvement in the murder of her husband.

### Facts and Procedural History

On June 4, 1999, Edward Byrom, Sr. (hereinafter "Edward") was fatally shot four times

in the chest with his own 9 millimeter pistol inside of his home in Iuka, Mississippi. Edward's

son, Edward Byrom, Jr. (hereinafter "Junior") called 911 after he discovered Edward's body

slumped over a coffee table in a spare bedroom that the family used as an entertainment room.

At the time Edward's body was found, his wife, the Petitioner in this cause, was a patient in the

Iuka Hospital. She had been admitted earlier in the day by her physician, Dr. Ben Kitchens, with

a diagnosis of double pneumonia. Within hours of Edward's death, Tishomingo County law

enforcement officials had questioned Petitioner and Junior and obtained statements from them.

---

[1] Pursuant to Rule 60(a) of the Federal Rules of Civil Procedure, this Court amends the
Opinion and Order entered in this case on August 2, 2011, in order to correct a clerical error. *See
infra* p. 30.

The police learned that Petitioner had devised a scheme to hire one of Junior's friends, Joey

Gillis (hereinafter "Gillis"), to kill her husband in exchange for $15,000 to be paid out of

Edward's insurance proceeds.  Petitioner, Junior, and Gillis were all arrested.

The events leading up to and immediately following Edward's murder are contested, but

all accounts appear to agree that the Byrom household was not one of tranquility.  Edward and

Petitioner fought frequently, usually about money, and Junior would often intercede when the

fights escalated.  While Petitioner alleges that Edward was physically, sexually, and verbally

abusive to her, not all of the fights in the home were between the parents.  Fights often broke out

between Junior and his dad, as well, over disputes about Junior's drug use, his partying, and the

fact that he was an unemployed high-school dropout.  Junior estimates that the family would get

into screaming and cursing arguments at least twice a week in the six months prior to Edward's

death, and that the fights were usually worse when alcohol was involved.  Petitioner and Edward

both drank whiskey regularly to the point of intoxication, and Junior threw frequent parties at the

home that involved the consumption of alcohol, marijuana, cocaine, and prescription pills.

Petitioner and Edward would often stay at a local motel when Junior threw a party.  Junior's

friends spent a lot of time at his house aside from the weekend parties, however, and Petitioner

frequently spent time with the teenagers.  She admits that she occasionally purchased alcohol for

them, and Junior states, though Petitioner denies it, that she sometimes smoked marijuana with

him.

From the accounts of Petitioner and Junior, Edward generally preferred to detach himself

from his family when he was home.  They maintain that he often ate and slept in the

entertainment room, which had been a sound studio at one time.  There was shag carpet on the

walls and black plastic covering the windows, which Petitioner maintains was for the purpose of allowing Edward to feed his addiction to pornography in private. Petitioner alleges that Edward forced her to view commercial pornography and engage in masturbatory acts while he videotaped her, in addition to forcing her to engage in sexual activities with women he brought home with him. She maintains that she was physically abused when she refused to submit to Edward's demands, and that her fear that Edward would harm her or Junior kept her from leaving Edward.

It was after a graduation party that Junior threw at the Byrom home in May 1999 that Petitioner's plan to have Edward killed began to form. Edward and Petitioner had been staying at a motel, but they returned home while the party was still ongoing. Junior and Petitioner allege that Edward became angry, yelled at everyone to leave, pushed Petitioner to the ground, and struck Junior and one of Junior's friends. After Edward's angry outburst, Petitioner alleges that she, Junior, and his friends began to joke about having Edward killed. Junior states that sometime shortly thereafter, Petitioner asked him if he could find someone who would murder Edward.

Junior testified that he approached his friend, Joey Gillis, about the murder approximately a week prior to Edward's murder. Petitioner and Gillis agreed that he would find someone to murder Edward in exchange for $15,000, which would be paid after Petitioner collected the proceeds from Edward's insurance.[2] Petitioner stated that the initial plan was for someone to hide in the woods across the street from the house and shoot Edward as he waited for his ride to work. Edward worked seven days a week, and on most days, he would wait to be picked up at

---

[2] Junior testified at trial that Gillis stated that he was not the triggerman, but no evidence implicating anyone other than Petitioner, Junior, and Gillis was presented at trial.

the end of his driveway.  According to Petitioner, attempts to carry out this plan failed on the

Wednesday and Thursday before the murder.  The first attempt failed because a neighbor was

outside in his garden at the time.  Another attempt failed when the Byroms' dogs were let out of

the house and began approaching Gillis, who was hiding in the woods.[3]  On Friday, June 4, 1999,

however, the plan was carried out.

Junior states that he got into an argument with his dad when he arrived home at

approximately 1:30 a.m. on the morning of the murder, and that he went to sleep after the

argument.  (*See* Def. Trial Ex. 70).[4]  Sometime later that morning, Petitioner went to see her

physician, Dr. Kitchens, who told her that he was admitting her to the hospital to treat her for

double pneumonia.  Petitioner returned home to gather her things and tell Edward that she was

being admitted to the hospital, and she estimates that she and Edward left for the hospital around

11:00 a.m.  Junior testified that sometime after his mother and father left for the hospital, Gillis

came into his bedroom and said that Petitioner wanted Edward murdered that day.

Petitioner's illness on the day of the murder is only one sickness in a medical history that

demonstrates illnesses that are staggering in both quantity and scope.  Petitioner has been

hospitalized numerous times.  One hospitalization followed a February 1997 suicide attempt.

---

[3] It is unknown whether Gillis was alone at the time.

[4] The trial record in this case consists of sixteen separately bound volumes, but they are
not consecutively paged.  The first nine volumes contain pleadings, orders, and various papers,
and the Court refers to these as "SCP Vol. _, __."  The actual trial record is made up of volumes
ten through sixteen and is referenced as "Trial Tr. Vol. __, ___."  Otherwise, the Court notes that
its use of "PCR Ex.__" refers to exhibits filed in post-conviction relief; "Reply Ex. __" refers to
exhibits attached to Petitioner's reply to the State's Answer in these proceedings; and "State Trial
Ex. __" or "Def. Trial Ex. __" refers to the exhibits introduced by either the State or defense at
the capital murder trial.

She has undergone numerous surgeries, several of which were exploratory, in addition to bilateral hip replacement and a hysterectomy.  Many of her physical illnesses are thought to have been related to her diagnosis of Munchausen syndrome, which she manifests by deliberately producing or feigning symptoms in order to garner sympathy and attention.[5]  *See* Harold L. Kaplan & Benjamin J. Sadock, *Synopsis of Psychiatry: Behavioral Sciences/Clinical Psychiatry* 656 (8th ed. 1998).  As part of the disorder, Petitioner chronically and intentionally ingested rat poison, and medical records report the suspicion that she was ingesting poison as early as 1989.  Dr. Keith Caruso, a psychiatrist authorized to assist in defense of this case, opines that Petitioner developed the disorder, along with Borderline Personality Disorder, in order to seek hospital admission and escape the abusiveness in her home.  (Reply Ex. 6, Ex. C at 8).  Additionally, Petitioner suffers from recurrent depression, alcohol dependence, lupus, hypertension, fibromyalgia, and Factor X deficiency, which is an inherited bleeding disorder that requires her to receive periodic transfusions of frozen plasma.  These illnesses required frequent trips to the hospital, and frequent bills resulted.  The resulting expenses were another source of friction between Petitioner and Edward.  They argued over medical bills on the morning of his murder.

According to her hospital admission records, Petitioner was admitted to the Iuka Hospital at approximately 10:50 a.m. on June 4, 1999. When she was first hospitalized, Petitioner was treated with IV fluids and was given her regular medications.  Among these medications were

---

[5] Petitioner has been diagnosed with Factitious Disorder, which is "characterized by physical or psychological symptoms that are intentionally produced or feigned in order to assume the sick role."  *See American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* 513 (4th ed. 2000).  In Petitioner's case, it is the intentional production of physical symptoms, which is commonly labeled as "Munchausen syndrome" after German Baron Karl F.H. von Munchhausen.  *See* Kaplan & Sadock, *supra,* 656.

Talwin, a painkiller; Flexeril, a muscle relaxant; Prilosec, for stomach ulcers/acid; Restoril, a sleep aid; Synthroid, a thyroid medication; Prednisone and Plaqueril, which were prescribed to treat lupus; and Zoloft, which treats depression.  (*See, e.g.*, Pet. Ex. 9, Aff. of Dr. Anthony Verlangieri).[6]  Sometime later that afternoon, Junior arrived at the hospital and told Petitioner that "it was done."  She stated she told him to go make sure that Edward was dead, and to call an ambulance if he was not.  Junior returned home, stopping on the way to speak to friends who he invited home with him so that they could smoke marijuana.  When they entered the house, Junior found his father dead and called 911.  Subsequently, Petitioner was informed of her husband's death.  At 4:50 p.m., Dr. Kitchens ordered that Petitioner be given an injection of Librium, a benzodiazepine, which is used to control agitation normally associated with alcohol withdrawal[7], and that she be given an injection every four hours thereafter, or as needed.

Not long after he arrived at the crime scene, Tishomingo County Sheriff, David Smith, became suspicious that Junior was involved in Edward's murder.  During the course of his 911 call, Junior told the dispatcher that his dad had been shot.  When officers arrived at the Byrom home, however, Junior asked whether Edward had suffered a heart attack.  Junior also had cuts on his knuckles and blood on the back of his pants near the belt line and leg.[8]  Junior was taken into custody to await questioning, and he later implicated himself, Petitioner, and Gillis in the

---

[6] Dr. Verlangieri does not specifically list all of these as having been part of her medications at the time of the crime.  Her June 1999 hospital records demonstrate, however, that she was given these medications while hospitalized.  (*See* Def. Motion to Supplement, ECF No. 64-1).

[7] *See* Harold & Sadock, *supra*, 400.

[8]  The blood was later determined to be Junior's own, from an injury that he said he received when he punched an interior door to the home after discovering his father's body.

murder.

Although the exact timing and order of Junior's first interview and Petitioner's first interview are disputed, it appears that a law enforcement officer was dispatched to the hospital to talk to Petitioner before Junior gave any statement implicating Petitioner in the murder. Rick Marlar, an investigator with the Criminal Investigation Bureau of the Mississippi Highway Patrol, went to the hospital to ask about weapons that might have been in the Byrom home and learn about the relationship between Edward and Junior. He did not consider Petitioner a suspect at the time, and she made no incriminating statements during the 8:38 p.m. interview. After Junior was questioned, however, the police went back to the hospital to speak to Petitioner.

Petitioner was confronted at around 10:47 p.m. on June 4 with the Tishomingo County Sheriff's assertion that Junior had confessed an involvement in the murder. During the interview, she implicated herself, Junior, and Gillis in a murder-for-hire scheme. Gillis was taken into custody for questioning, and he later confessed that he was involved in the murder, but he maintained that someone else actually killed Edward. On October 21, 1999, Petitioner was indicted by the Tishomingo County Circuit Court under Miss. Code Ann. § 97-3-19 (2)(d), which provides that:

> The killing of a human being without the authority of law by any means or in any manner shall be capital murder in the following cases: (d) Murder which is perpetrated by any person who has been offered or has received anything of value for committing the murder, and all parties to such a murder, are guilty as principals[.]

In December, an order was entered appointing Terry Wood and Sonya "Sunny" Phillips as Petitioner's trial counsel. The State's theory was that Edward was killed in a murder-for-hire, and the defense's theory was that Petitioner confessed to the scheme only to protect Junior, who

shot Edward out of rage at the mistreatment Edward inflicted upon the family.

As a result of an order entered after a consolidated hearing on June 22, 2000, all three co-defendants underwent seperately administered psychological examinations conducted by Dr. Criss Lott for the purpose of evaluating competency-related issues. (*See* SCP Vol. 1, 100-104). Prior to trial, Petitioner was granted the assistance of licensed psychiatrist, Dr. Keith Caruso, to evaluate the voluntariness of her confession and to identify mitigating evidence that could be offered at the penalty phase of trial. (Reply Ex. 6).

A jury trial commenced November 13, 2000, with the Honorable Thomas J. Gardner, III, presiding. Petitioner's June 4 statement and a subsequent statement were later suppressed by the court because of defective *Miranda*[9] warnings. Two additional statements, taken on June 6 and June 7, were admitted against her at trial. Junior testified against his mother as part of a plea bargain he entered into on November 6, 2000. He testified that on the day of the murder he dropped off Gillis, who was wearing a glove on his right hand and carrying the 9 millimeter pistol, near a wooded area close to the Byrom home. He picked him up at the same location thirty minutes later, and Gillis told him that Edward was dead. Junior later led police to the recovery of the pistol and the shirt Gillis had been wearing, but police never located the black cotton glove.

The jury found Petitioner guilty of capital murder on November 17, 2000. Petitioner petitioned for a sentencing hearing without a jury, to which the prosecution agreed, and the trial court found that Petitioner made a valid waiver of her right to jury sentencing. At sentencing,

---

[9] An individual subject to a custodial interrogation must generally be advised of rights as identified in *Miranda v. Arizona*, 384 U.S. 436, 479 (1966).

Petitioner did not present live witness testimony, but she offered into evidence the report of defense expert Dr. Caruso, medical records from Dr. Ben Kitchens, and the report of the court-ordered evaluation conducted by Dr. Lott. Defense counsel later stated they believed that the trial court made several reversible errors by the time the sentencing phase commenced, and that they did not present live testimony so that when a retrial occurred, the State would not have previous knowledge of the mitigation evidence. They also admitted that they wanted Judge Gardner to sentence Petitioner so that he would be under a conflict in the event of a retrial, and because the jury waiver itself might be grounds for reversal. At the conclusion of the hearing, Petitioner was sentenced to die by lethal injection.

In March 2001, Gillis pled guilty to accessory after the fact to capital murder and conspiracy to commit capital murder. While his own case was being prepared for trial in May 2001, Junior repudiated his plea deal. On June 21, 2001, less than a month after he withdrew his guilty plea, Junior pled guilty to conspiracy to commit capital murder, accessory before the fact to grand larceny, and accessory before the fact to burglary with intent to commit assault.

Petitioner's appeal was denied by the Mississippi Supreme Court, as was her petition for post-conviction relief. *See Byrom v. State*, 863 So.2d 836 (Miss. 2003) ("*Byrom I*"), *cert. denied, Byrom v. Mississippi*, 543 U.S. 826 (2004); *Byrom v. State*, 927 So.2d 709 (Miss. 2006) ("*Byrom II*"), *cert. denied, Byrom v. Mississippi*, 549 U.S. 1056 (2006). This petition followed. The parties have filed briefs in support of their respective pleadings, and this Court has expanded the record to include Petitioner's Iuka Hospital records from June 1999. This matter is now ripe for review.

**Applicable Standards**

This petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), such that this Court may not grant relief in connection with any claim adjudicated on the merits in State court proceedings unless that adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established United States Supreme Court precedent; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the presented evidence. *See* 28 U.S.C. § 2254(d)(1) & (2); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). The factual findings of the State court are presumed correct, and Petitioner bears the burden of rebutting the presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

Federal habeas relief may be granted under the "contrary to" clause where the State court (1) arrives at a conclusion opposite that reached by the Supreme Court on a question of law; or (2) decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *See Williams v. Taylor*, 529 U.S. 362, 405 (2000). Under the "unreasonable application" clause, a federal court may grant relief where the State court applies the correct legal principle to the facts in an unreasonable manner. *See id.* at 407-08; *Brown v. Payton*, 544 U.S. 133, 141 (2005). Whether a decision is "unreasonable" is an objective inquiry, and it does not turn on whether the decision is merely incorrect. *See Schriro*, 550 U.S. at 473 ("The question under the AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable - a substantially higher threshold."); *Williams,* 529 U.S. at 410-11; *Morrow v. Dretke*, 367 F.3d 309, 313 (5th Cir. 2004) (habeas relief merited where state decision both incorrect and objectively unreasonable).

A petitioner is required to exhaust her claim in the highest court of the state prior to seeking federal habeas relief. *See* 28 U.S.C. § 2254(b)(1); *Morris v. Dretke*, 379 F.3d 199, 204 (5th Cir. 2004); *see also Wilder v. Cockrell*, 274 F.3d 255, 259 (5th Cir. 2001) ("[W]here petitioner advances in federal court an argument based on a legal theory distinct from that relied upon in the state court, he fails to satisfy the exhaustion requirement."). While a federal court may not grant federal habeas relief on an unexhausted claim, it may deny relief on an unexhausted claim. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); *Mercadel v. Cain*, 179 F.3d 271, 276 (5th Cir. 1999).

Where a petitioner fails to exhaust her State remedies, but it is clear that the State court to which she would return to exhaust the claim would find the claim procedurally barred, the claim is procedurally defaulted for purposes of federal habeas corpus relief. *See, e.g., Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991); *Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001). Likewise barred from federal habeas review are claims that the State court held procedurally barred on review on the basis of independent and adequate State law grounds. *See, e.g., Coleman*, 501 U.S. at 729-30 ("The doctrine applies to bar federal habeas claims because the prisoner had failed to meet a state procedural requirement. In these cases, the state judgment rests upon independent and adequate state procedural grounds."); *Wainwright v. Sykes*, 433 U.S. 72, 87-88 (1977). Moreover, where a State court holds a claim barred on independent and adequate State law grounds and reaches the merits of the claim in the alternative, the bar imposed by the State court is not vitiated. *See Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989); *Thacker v. Dretke*, 396 F.3d 607, 614 (5th Cir. 2005) (procedural bar imposed for petitioner's failure to

contemporaneously object and preserve claim for review not circumvented by State court's alternative holding that constitutional claim lacked merit).

A petitioner may receive federal habeas review of a procedurally defaulted claim if she can demonstrate "'cause' for the default and 'prejudice attributable thereto,' or demonstrate that failure to consider the federal claim will result in a 'fundamental miscarriage of justice.'" *Coleman*, 501 U.S. at 749-50 (internal citations omitted). In order to demonstrate cause, a petitioner must show "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Prejudice may be demonstrated by showing that the errors "worked to [the petitioner's] *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.* at 494 (internal quotations omitted). If a petitioner is unable to demonstrate cause and prejudice, she may obtain review of his claim by demonstrating that the application of the procedural bar would result in a miscarriage of justice because she is actually innocent. *See House v. Bell*, 547 U.S. 518, 537-38 (2006).

Counsel's failure to preserve a claim in State court can constitute cause sufficient to overcome a procedural default. *See Coleman*, 501 U.S. at 753-54. However, a petitioner claiming ineffective assistance of counsel for the purpose of having the underlying substantive claim reviewed on its merits must ordinarily have presented the ineffective assistance of counsel claim independently in State court before it may be argued as cause to excuse a procedural default. *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000). A federal habeas petitioner's claim that she was denied the effective assistance of counsel at trial is generally measured by the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail on a

claim of ineffective assistance of counsel, Petitioner must establish that (1) her trial counsel's performance was so deficient that it cannot be said that the attorneys were functioning as "counsel" within the meaning of the Sixth Amendment, and (2) the deficient performance prejudiced her defense. *See id.* at 687; s*ee also Boyle v. Johnson*, 93 F.3d 180, 187 (5th Cir. 1996) (ineffective assistance of counsel claims analyzed under *Strickland* framework). As claims of ineffective assistance of counsel involve mixed questions of law and fact, claims previously considered and rejected by the State court may be overturned only if "contrary to, or involv[ing] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *Strickland*, 466 U.S. at 698.

With the foregoing standards in mind, the Court turns to Petitioner's specific claims for relief.[10]

## Actual Innocence

Petitioner concedes that several of the claims raised in the petition might be procedurally defaulted. She argues, however, that this Court's failure to consider the otherwise procedurally defaulted claims raised in the petition would result in a fundamental miscarriage of justice, as she is actually innocent of the death penalty. *See Hughes v. Quarterman*, 530 F.3d 336, 341 (5th Cir. 2008) (*citing Coleman*, 501 U.S. at 750). The law recognizes that the miscarriage of justice exception is implicated where a petitioner can demonstrate actual innocence of the substantive offense for which she was convicted or actual innocence of the death penalty under the applicable state law. *See Schlup v. Delo*, 513 U.S. 298, 326-27 (1995); *Sawyer v. Whitley*, 505 U.S. 333,

---

[10] In the initial petition, Petitioner raised thirteen separate claims for relief. Some of these claims have been consolidated for convenience, but all thirteen have been independently considered by the Court.

340 (1992).  The claim is not in and of itself a ground for habeas relief, but rather, it acts as a

"gateway" that allows review of otherwise procedurally defaulted claims.  *See, e.g., Herrera v.*

*Collins*, 506 U.S. 390, 404 (1993).[11]  To raise a claim of actual innocence, Petitioner must first

produce "new reliable evidence - whether it be exculpatory scientific evidence, trustworthy

eyewitness accounts, or critical physical evidence - that was not presented at trial."  *Schlup*, 513

U.S. at 324.  Then, she must show that it is "more likely than not, in light of the new evidence,

no reasonable juror would find [her] guilty beyond a reasonable doubt."  *House*, 547 U.S. at 538;

*see also Schlup*, 513 U.S. at 323-24.  The exception is extremely narrow, applying only to those

cases "where a constitutional violation has probably resulted in the conviction of one who is

actually innocent."  *Murray v. Carrier*, 477 U.S. 478, 495-96 (1986).

Petitioner maintains that newly discovered evidence demonstrates that Edward's death

was not a murder-for-hire, inasmuch as Junior confessed to examining psychologist Dr. Lott that

he alone killed his father while in a fit of rage.  She maintains that the evidence supports her

claim that the State suppressed Dr. Lott's report in violation of *Brady v. Maryland*, 373 U.S. 83

(1963),[12] and that this otherwise procedurally defaulted claim may be reviewed because proof

now exists that she did not meet the condition of eligibility that elevated her crime to capital

murder.  Because the murder was not "perpetrated by any person who [had] been offered or [had]

_____

[11] The Court notes that, to the extent Petitioner's claim could be construed to raise a
freestanding constitutional claim of actual innocence, it is not cognizable on habeas review.  *See
Herrera v. Collins*, 506 U.S. 390, 400, 417 (1993).

[12]*Brady v. Maryland* requires that the prosecution disclose evidence that is 1) favorable to
the accused; and 2) material either to guilt or to punishment.  *United States v. Bagley*, 473 U.S.
667, 674 (1985); *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

received anything of value for committing the murder" as required under Miss. Code Ann. § 97-3-19(2)(d), she argues, she cannot be guilty of murder-for-hire, and thus, capital murder, under Mississippi law.

Dr. Criss Lott was ordered by the trial court to conduct a psychiatric evaluation of Petitioner, Junior, and Gillis. (*See* SCP Vol. 1, 103-04). Although defense counsel objected to the same psychiatrist examining all three defendants, the trial judge stated that he had spoken to Dr. Lott and received his assurances that there would be no conflict in the separate examinations. (*Id.* at 107-08). The trial court ordered the reports sent to the court to be reviewed *in camera*, and ruled that the State would not be entitled to a copy of the reports absent the court's consent. (*Id.* at 95-98; 108-09). The examinations were scheduled to occur in July 2000, with Petitioner's examination scheduled first. (*See*, *e.g.*, SCP Vol. 1, 95-98; R. Memo Ex. B; Reply Ex. 3). Although it is not known when the reports were completed, the record indicates that Petitioner's examination was completed by August 11, 2000. (Trial Tr. Vol. Vol. 10, 5-6). Dr. Lott's report concerning Petitioner was ordered released to the State on October 18, 2000, but there is no indication in the current record that any release orders were entered in either Gillis' or Juniors' cases. (*See* Trial Tr. Vol. 10, 59-61; SCP Vol. 3, 428-29). To the Court's knowledge, Petitioner has never been granted access to Dr. Lott's report of his psychological evaluation of Junior.[13]

Petitioner apparently learned of Junior's alleged statements to Dr. Lott when two area newspapers cited the prosecutor's comments about the plea deal offered to Gillis in March 2001. The *Tishomingo County News* published the following on March 22, 2001:

According to [the] Assist. District Attorney. . . , in his testimony against his

---

[13] This Court twice denied Petitioner discovery relating to this issue.

> mother, Byrom Jr. made some conflicting statements about what happened. Since
> then, in preparation for the Gillis trial, it was learned that he also made a
> conflicting statement to a psychologist.

(*See* Pet. Ex. 7-B). *The Daily Corinthian* attributed to the Assistant District Attorney that the

prosecution learned "[w]hile preparing for the Gillis trial," that Junior made "another conflicting

statement to his psychologist" and that those statements could have "seriously compromised'

[Junior]'s future testimony against Gillis." (Pet. Ex. 7-A, March 16, 2001).

Habeas counsel submits to this Court that he spoke to Dr. Lott and Gillis' trial attorneys,

and that the recollection of each was that Junior did confess to Dr. Lott that he murdered his

father. (*See* Reply Ex. 4 & 5, Decls. of David L. Calder). Gillis' attorneys refused to make a

declaration in the matter, however, and habeas counsel maintains that Dr. Lott, while initially

agreeable to meeting with the purpose of discussing Junior's evaluation, refused to do so after

Judge Gardner ordered him not to discuss the case without the trial court's approval. (*Id.*).

Petitioner also notes that an attorney, Louwylnn Vanzetta Williams, and an investigator, Tomika

Harris, both with the Mississippi Office of Post-Conviction Counsel, interviewed Gillis in

November 2004. They report that he stated at that time that Petitioner did not hire him to kill her

husband. (*See* Pet. Ex. 13, 14).

Petitioner argues that further evidence of the unreliable nature of Junior's testimony is

found in the fact that on May 31, 2001, he repudiated the plea bargain he struck prior to testifying

against his mother. She notes that Junior, not Gillis, had gunpowder on his palms. (Trial Tr.

Vol. 15, 888-89, 91). She also argues that letters written from Junior to Petitioner, which were

not allowed into evidence at trial because of defense's counsel failure to disclose them, contain

Junior's admission that he killed his father in a fit of rage. (*See* Trial Tr. Vol. 14, 719-20; 740-

45).  Petitioner maintains that if the jury had considered Dr. Lott's report and/or testimony that Junior confessed to the murders, along with the letters Junior wrote confessing to the murders, it is probable that no reasonable jury would have found her guilty of capital murder.

Petitioner raised a claim of actual innocence on post-conviction review, and the Mississippi Supreme Court considered whether she could claim actual innocence and exempt the procedural default imposed against her claims.  *Byrom II*, 927 So.2d at 729.[14]  The court noted that Petitioner had attached only her own affidavit to the petition, and that she otherwise merely stated that the jury's findings were wrong.  *Id.*  The court rejected the claim as having no merit. *Id.*

The Court notes that while courts agree that a claim of actual innocence requires "new" evidence to be presented, they disagree as to whether the evidence must be "new" in the sense that it was not available or discoverable with due diligence at the time of trial, or whether it must be "newly presented."  *See Wright v. Quarterman*, 470 F.3d 581, 591 (5th Cir. 2006).  While the Fifth Circuit has not conclusively determined the issue of "new" versus "newly presented" evidence in this context, it has held that evidence will not meet the standard if "it was always within the reach of [the inmate's] personal knowledge or reasonable investigation."  *Moore v. Quarterman*, 534 F.3d 454, 465 (5th Cir. 2008).  While Petitioner may not have been aware of Junior's alleged statements to Dr. Lott at the time of trial, she was certainly in possession of the knowledge at the time of her direct appeal and post-conviction review.  She failed, however, to present the State court with a claim that the information was improperly suppressed.

---

[14] The Mississippi Supreme Court also found that, to the extent Petitioner was seeking to argue that her conviction and/or sentence was against the weight or sufficiency of the evidence, the claim was barred.  *Id.*

The newspaper articles giving rise to Petitioner's claim were published in March 2001.

The following excerpt appears in Petitioner's November 2001 appellate brief:

> It has come to light since the trial of [Petitioner] that Dr. Lott revealed to counsel for Gillis that Junior confided in him that he (Junior) had shot [Edward]. (Obviously this new information is not in [Petitioner's] record but on remand would no doubt be of significant value in her defense. The information was obtained from Gillis' counsel)[.]". (Pet. DA Brief 9).

> Although not part of the record in this case, a few months after the trial of [Petitioner], Dr. Lott divulged to Gillis' attorneys that Junior had confided to him that he had shot [Edward.] This revelation no doubt helps the cause of [Petitioner] and raises Brady issues (did the state not have copies of Junior's report prior to [Petitioner]'s trial?) since it is consistent with the physical evidence and the theory argued at trial by the defense. Nevertheless[,] this is merely fortuitous for [Petitioner] as it could have just as well occurred that something erroneous[] could have been divulged by Junior and then later, asked of [Petitioner] by Dr. Lott to which she may have given erroneous answers to protect her son with her response making its way into the report of Dr. Lott.

(Pet. Direct Appeal Br. 16).[15] During oral argument before the Mississippi Supreme Court on December 4, 2002, counsel for the State informed the court, in response to a justice's inquiry as to whether Junior admitted killing his father, that "[t]here is some speculation of something that happened with Dr. Lott after the trial, . . . but I have nothing in the record." (Pet. Ex. 15 at 37). Additionally, the Court notes that the information learned as a result of Gillis' November 19, 2004 interview was not presented on post-conviction review, despite the fact that one of the interviewers, Ms. Harris, was one of the post-conviction attorneys and could have raised the issue of Gillis' statement when the petition for post-conviction relief was filed in February 2005. (*See* Pet. Ex. 14).

---

[15] Counsel was not arguing the basis now raised, but rather, that the trial court erred in requiring Petitioner to submit to an evaluation by Dr. Lott and turn over her medical records to him. (*See* Pet. Direct Appeal Br. 15-17).

Aside from the issue of whether the evidence is sufficiently "new" to warrant relief, the Court is not persuaded that the evidence is of such a character that it is "more likely than not any reasonable juror would have reasonable doubt" if the evidence had been considered. *House*, 547 U.S. at 538. A habeas court does not ask whether the evidence would have created reasonable doubt in the mind of one of the jurors, because there is no presumption of innocence in habeas proceedings. *Bosley v. Cain*, 409 F.3d 657, 664 (5th Cir. 2005). Rather, the issue is whether it is more likely than not that "no reasonable juror" would have found her guilty. *Schlup*, 513 U.S. at 329. Petitioner fails to satisfy this exacting standard.

Petitioner's jury was presented with evidence that Junior had gunpowder residue on him, that Junior had been fighting with his father, and that Junior admitted to telling others that he shot his father. While defense counsel was not allowed to introduce into evidence the actual letters written from Junior to Petitioner while they were in jail awaiting trial, he was allowed to read from the letters and question Junior about the contents. Junior testified that he and his mother began to realize that their letters were being intercepted by law enforcement, and that they began fabricating details of the crime in the hopes of avoiding punishment. (Trial Tr. Vol. 14, 737-38, 750, Trial Tr. Vol. 15, 751-54). He maintained that when he wrote letters taking full responsibility for the murders, he was depressed and "ready to take the rap for everything to be able to free my mother and Joey." (Trial Tr. Vol. 15, 754). Junior admitted that he had told various lies about his involvement, and that the contents of the letters were not the truth. (*Id.*).

Moreover, Gillis refused to sign an affidavit attesting to the things reported in the affidavits of Ms. Williams and Ms. Harris, and Junior's contradictory statements indicate a lack of reliability that lessens the persuasiveness of Petitioner's argument. *See, e.g., Moore*, 534 F.3d

at 465.  Both appellate and post-conviction counsel were aware that Junior had allegedly made statements implicating himself as the person who shot Edward and did not pursue this matter as a claim.  Additionally, Petitioner confessed in great detail to facts of this crime, including the failed attempts, that are consistent with Junior's own account of the scheme.  Even if Junior did make inculpatory statements to Dr. Lott, such would be consistent with his trial testimony that he made self-incriminating admissions to others.  Having considered the evidence presented to the Mississippi Supreme Court, as well as the evidence first presented in these proceedings, the Court finds that Petitioner has failed to demonstrate that no reasonable juror would have found her guilty of capital murder beyond a reasonable doubt if the juror had known of Dr. Lott's report of Junior.  Therefore, Petitioner has failed to meet the high standard of actual innocence sufficient to obtain review of any defaulted claim raised in the petition, and the Court will not address Petitioner's allegations of actual innocence further in the opinion.  Rather, the Court will consider any arguments of cause and prejudice asserted by Petitioner to secure review of any claims raised in her petition that are defaulted.

## I.  Exclusion of Pornographic Video

As part of evidence collection at the crime scene, law enforcement officials took numerous videotapes from the Byrom home, some of which were videotape copies of commercially produced pornographic movies that Edward had rented.  (*See* Trial Tr. Vol. 10, 10, 72).  Additionally, there were camcorder tapes recovered, and some of the home-movie footage on these tapes had been altered, either through someone's attempt to erase the tape or record over the original content.  (*Id.* at 71).  A few surviving frames in one of these tapes showed Petitioner engaged in a masturbatory act.  (*Id.*).  Prior to trial, the State moved to have the tapes and any

reference to them deemed inadmissible at trial, arguing that such evidence was not relevant and only went to the character of the victim. (*See id.* at 63). The defense intended to argue at trial its theory that it was Edward's addiction to pornography and his forcing of Petitioner to engage in sexual acts while he videotaped her that provided Junior's motive to kill his father. (*See id.* at 63-68). Defense counsel argued that the home video was mitigating, as it was relevant to the theory that Edward forced Petitioner to engage in pornography. (*Id.* at 71). The trial court ultimately granted the State's motion, finding that there was no justifiable reason to show the jury the pornography. (*Id.* at 73). It ruled that defense counsel could introduce testimony about the tapes and ordered that defense counsel could take the home video to a technician and have the video frames reduced to a 8x10 photograph. (*Id.* at 87-89; SCP Vol. 3, 427). The trial judge informed counsel that he would review the photograph and determine whether he would allow it to be admitted. (*Id.* at 89).

Outside of the jury's presence at trial, the court considered whether defense counsel should even be allowed to allude to the existence of pornography in the Byrom home. (Trial Tr. Vol. 13, 534-544). After hearing argument, the trial court ruled that evidence of the pornographic material found at the home could not be explored through testimony, except insofar as it might provide a motive for any conduct Junior might have independently undertaken to cause his father's death. (*Id.* at 533-34).

On direct appeal, the Mississippi Supreme Court rejected Petitioner's claim that the trial court abused its discretion in refusing to admit the videotapes.[16] *Byrom I,* 863 So.2d at 853-54.

---

[16] Petitioner also alleged that law enforcement officers intentionally altered the crime scene by destroying or releasing to the Byrom family additional pornographic videos, as there were videocassettes at the crime scene, as shown through crime scene video and photographs,

The court noted that other evidence demonstrated Petitioner's theory that the crime was motivated by the abuse that Edward heaped on Petitioner, and that the crime scene videotapes and photographs were sufficient to show Edward's obsession with pornography. *Id.* at 854. Three justices dissented on this issue, stating that they would have found that the trial court erred in failing to allow Petitioner to introduce the home video. *Id.* at 885. (Pittman, C.J., dissenting, joined by McRae, P.J. and Graves, J.).

On post-conviction review, Petitioner again argued that the home video and Junior's letters were erroneously excluded and denied her a fair trial. The court agreed with Respondents that the claim was barred, citing both Petitioner's waiver of the issue and res judicata to preclude review of the claim.[17] *Byrom II,* 927 So.2d 709, 726 (Miss. 2006). The court otherwise found the issue without merit. *Id.*

On habeas review, Petitioner argues that the trial court unconstitutionally limited her right to present a meaningful defense and present mitigating evidence at sentencing when it prohibited the introduction of the pornographic videotapes collected from the crime scene. Alternatively, she argues that counsel was ineffective for not attempting to renew their attempt to submit the tapes or photographs in the sentencing hearing. The parties are in dispute as to whether Petitioner's substantive claim is barred on habeas review. The Court acknowledges that a

---

that were not taken into evidence. The court rejected this claim, finding that Petitioner had not shown that any law enforcement officer acted in bad faith. *Id.* at 853-54.

[17] The statute cited by the Court provides that the (1) "[f]ailure by a prisoner to raise objections, defenses, claims, questions, issues or errors either in fact or law which were capable of determination at trial and/or on direct appeal. . . shall constitute a waiver thereof and shall be procedurally barred. . . . (3) The doctrine of res judicata shall apply to all issues, both factual and legal, decided at trial and on direct appeal." Miss Code Ann. § 99-39-21(1)(3).

reasonable reading of the opinion might lead one to conclude that the Mississippi Supreme Court found the issue of the admissibility of the videotapes barred on the ground of res judicata, while it rejected the due process argument as not having been presented on direct appeal. While the court expressly found the claim procedurally barred, this Court would have to guess as to why, as it did not clarify which portions of the claim were res judicata and which were waived. Therefore, the Court will review the claim, as res judicata does not bar federal habeas review. *See Cone v. Bell*, 556 U.S. ___, ___, 129 S. Ct. 1769, 1780-82 (2009).

A federal habeas court has no jurisdiction to determine whether the state court reasonably applied its rules of evidence. *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) ("It is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Wood v. Quarterman*, 503 F.3d 408, 414 (5th Cir. 2007). A trial court ruling on an evidentiary issue provides a basis for federal habeas relief only if it so prejudiced the petitioner that it rendered the trial unfair. *Estelle*, 502 U.S. at 67-68. The Fifth Circuit has held that the failure to admit evidence is a due process violation when the omitted evidence is a "crucial, critical, highly significant factor in the context of the entire trial." *Johnson v. Puckett*, 176 F.3d 809, 821 (5th Cir. 1999).

A "meaningful opportunity to present a complete defense" is a right guaranteed to criminal defendants by the Constitution. *Crane v. Kentucky*, 476 U.S. 683, 690 (1986). However, that right is not unfettered or absolute. *See, e.g., Montana v. Egelhoff*, 518 U.S. 37, 62 (1996). A trial judge has "wide latitude" to exclude marginally relevant evidence. *See Crane*, 476 U.S. at 689-90. In this case, the trial court did not prevent defense counsel from pursuing its theory, nor did it bar counsel from presenting allegedly mitigating evidence. The trial court

granted defense counsel the opportunity to explore whether Junior had any knowledge of any sexual exploitation of his mother by his father, and it allowed defense counsel the opportunity to reduce the videotape images of Petitioner to a photograph. While there is no indication anywhere in the record that trial counsel followed through with that order, there is also no indication in the record that the depiction would have necessarily shown that Petitioner was an unwilling participant in the video. Insofar as the mitigation portion of trial is concerned, the trial judge was the sentencer, and he was well aware of the allegations of physical and sexual abuse made by Petitioner. Therefore, the Court does not find that Petitioner was denied a fair trial by the court's refusal to introduce the videotapes into evidence.

Petitioner only briefly argued, in her rebuttal brief on post-conviction review, that counsel was ineffective for failing to raise this issue. (*See* "Rebuttal to State's Response to Petition for Post-Conviction Relief" 6). The court did not consider the argument. *See, e.g., Overstreet v. Allstate Ins. Co.*, 474 So.2d 572, 576 (Miss. 1985) (holding that appellate court is under no obligation to consider additional issues raised for the first time in a reply brief). Petitioner has never properly raised and exhausted counsel's performance on this issue as an independent claim for relief in State court, and it may not be used as a basis for federal habeas relief. *See Edwards v. Carpenter*, 529 U.S. 446, 451-52 (2000).

**II. Exclusion of Junior's Jailhouse Confession Letter**

Petitioner argues that the trial court denied her right to present a meaningful defense, effectively cross-examine witnesses, and rebut the State's case when it excluded from evidence letters written by Junior to Petitioner in which he confessed that he alone killed Edward. She maintains that in rejecting this claim, the Mississippi Supreme Court unreasonably determined

24

facts in light of the actual trial testimony, inconsistently applied its own rules concerning the appropriate remedy for a discovery violation, and unreasonably failed to apply clearly established federal law that requires courts to consider the impact of the excluded evidence on the truth-finding process.

As previously discussed, Junior and Petitioner exchanged letters while they were in jail. The letters that Petitioner alleges were erroneously excluded from trial were letters written from Junior to Petitioner that were not intercepted by law enforcement officials. Petitioner apparently turned these letters over to defense counsel at some point prior to trial. At a pretrial hearing held on October 18, 2000, defense counsel informed the court that he had impeachment material to use in the event that Junior testified consistently with the prosecution's theory of the case. (*See* Trial Tr. Vol. 10, 36). After hearing arguments from both the prosecution and the defense as to whether the information should be disclosed, defense counsel was told to produce the material or risk it being objectionable at trial. (*Id.* at 37-40).

At trial, Junior testified that Edward was killed as part of a murder-for-hire scheme, which was consistent with the State's theory of the case. During his cross-examination of Junior, defense counsel Wood produced a letter written by Junior to Petitioner while they were both being housed in the Tishomingo County Jail. (*See*, *e.g.*, Trial Tr. Vol. 14, 714). Counsel attempted to introduce this letter, in which Junior stated that he alone killed Edward. (*See id.*; Def. Tr. Ex. 72). The prosecution objected, as the letter had not been previously disclosed, and the trial court took up the issue outside of the jury's presence. (*Id.* at 713). Defense counsel argued that the material was intended solely for impeachment purposes and did not have to be disclosed under the rules, while the prosecution argued that the rules prohibited the intentional

withholding of evidence in order to ambush opposing counsel. (*Id.* at 714-15). After recessing the jury for the evening, the trial court granted the prosecution's request for permission to question Junior about the letters, and it asked defense counsel if there was other evidence that had not been discovered. (*Id.* at 717-19). Counsel Wood stated that he had "other impeachment evidence" with which he intended to "impeach the daylights" out of Junior. (*Id.* at 719). The court cautioned Wood that nondisclosure would get the evidence excluded altogether or would delay the trial of the case, and that such nondisclosure would be at Wood's "own peril." (*Id.*).

After hearing argument regarding the letter's admissibility the following day, the trial court found that the evidence outlined the substantive theory of the defense's case and should be excluded in light of defense counsel's deliberate discovery violation. (*See id.* at 723-31) (referencing holding of *Coates v. State*, 495 So.2d 464 (1986)). In what the court acknowledged as hair splitting, it ruled that defense counsel could ask Junior about the contents of the letter, but that counsel could not handle the letter or otherwise make reference to existence of the letter. (*Id.* at 730-33). Later in his cross-examination of Junior, counsel attempted to ask Junior about another letter he wrote to Petitioner, and the proceedings were again recessed so that the trial court could determine the admissibility of the letter. (*See id.* at 740-41). The trial court again ruled that defense counsel could ask Junior if he made the statements, but that he could not refer to the existence of a letter. (*See id.* at 741-45).

Throughout the course of cross-examination, defense counsel was allowed to read directly from the letters. Junior admitted that he had told different stories about his involvement in his father's death, and he admitted that he wrote his mother a letter stating that he killed his father. (*Id.* at 740, 746). He admitted that he had told others that there was no conspiracy, and that he

alone shot his father after he had gotten mad at him. (*Id.* at 748-49). He denied making some statements in the letter, such as the fact that he told Gillis to hide the gun after he shot his father while Edward was asleep. (*Id.* at 747-48). However, he ultimately denied that he alone killed his father. (*Id*. at 749).

On redirect examination, the prosecutor elicited from Junior that he and his mother realized at some point after their arrest that their letters were being intercepted, and that they began to write letters with the specific intent that they be intercepted by law enforcement officers. (*Id.* at 750). He admitted that some of the letters outlined different schemes that they intended to use to avoid punishment for what they had done. (*Id.*). Junior stated that the letters defense counsel asked him about were part of the scheme. (Trial Tr. Vol. 15, 751-54). Junior stated that when he wrote the letters taking full responsibility for the murders, he was depressed and "ready to take the rap for everything to be able to free [Petitioner] and Joey." (*Id.* at 754). Junior stated that the contents of the letter were not the truth, and that he had never told the District Attorney or the State that he killed his father. (*Id.*). He admitted that he approached Gillis at his mother's request and discussed with him the amount of money Gillis wanted in exchange for his participation in the murder. (*Id.* at 767-68).

On direct appeal, the Mississippi Supreme Court rejected Petitioner's claim that the trial court improperly excluded the evidence, as the trial court followed the proper procedure to determine the sanction for defense counsel's deliberate discovery violation of substantive evidence. *See Byrom I,* 863 So.2d at 868-71 (Miss. 2004).[18] It also found that Petitioner was not

---

[18] The procedure followed by the court used the guidelines in *Box v. State*, 437 So.2d 19, 23-26 (Miss. 1983), which is now codified in URCC 9.04(I). That provision provides rules for a trial court faced with one party's objection to the other party's attempt to introduce evidence that

prejudiced by the sanction since she was able to elicit from Junior testimony favorable to the defense theory. *See id.* at 870-71. Three justices dissented, finding that they would reverse based upon the exclusion of the letters. *See id.* at 885 (Pittman, C.J., dissenting, joined by McRae, P.J. and Graves, J.). On post-conviction review, the court found the issue barred and otherwise without merit. *Byrom II*, 927 So.2d at 726.

States have the authority to interpret their own statutes, and absent an attempt to evade a federal issue, this Court is bound by that interpretation. *See, e.g., Jordan v. Watkins*, 681 F.2d 1067, 1079-80 (5th Cir. 1982); *see also Castillo v. Johnson*, 141 F.3d 218, 222 (5th Cir. 1998) (holding that absent an error that constitutes a denial of fundamental fairness, a habeas court does not interfere with the evidentiary rulings of a state court). Regardless of whether defense counsel honestly believed that he did not have to disclose the letters because they were evidence intended for impeachment, the fact remains that he was warned prior to trial that this failure to properly disclose evidence could result in the exclusion of the evidence. Defense counsel Wood's own statements leave no doubt that he deliberately withheld the evidence in order to surprise the State at trial, and Petitioner has not demonstrated unreasonableness in the Mississippi Supreme Court's rejection of this claim. *See Taylor v. Illinois*, 484 U.S. 400, 415 (1988) (finding that exclusion of evidence proper where counsel's explanation for intentionally failing to disclose evidence was "motivated by a desire to obtain a tactical advantage" that would "minimize the effectiveness" of

---

has not been disclosed. It provides, in part, that the court should grant time for the non-moving party to review the evidence, and if the non-moving party claims "unfair surprise or undue prejudice and seeks a continuance or mistrial, the court shall, in the interest of justice and absent unusual circumstances, exclude the evidence or grant a continuance . . . or grant a mistrial." *See* URCC 9.04(I).

the other party's examination and their ability to adduce evidence in rebuttal). The Court notes that Petitioner's argument, while relying on the Mississippi Supreme Court's citation to *Taylor*, involves whether Petitioner was provided an opportunity to effectively cross-examine Junior. The Court would observe that Petitioner's right under the Confrontation Clause of the Sixth Amendment is to the "*opportunity* for effective cross-examination." *See United States v. Whitfield*, 590 F.3d 325, 363 (5th Cir. 2009) (*quoting Delaware v. Van Arsdall*, 475 U.S. 673 (1986)) (emphasis in original). To the extent that Petitioner's opportunity was at all curtailed, it was because of the decision of the defense not to heed the court's warnings or otherwise follow the discovery rules.

The Court also finds that, even if it was error to exclude the letters, the error did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). While he did deny making some statements where he gave details as to how the murder transpired, Junior admitted telling his mother and others that there was no conspiracy and that he committed the murder. He also admitted that the letters referenced by defense counsel were some of the letters that were written with the intent that they be intercepted by law enforcement officials in hopes of keeping his mother from being charged with a crime. Despite admitting that he had told lies to various people, Junior stated that he had never told law enforcement officials or the State that he shot his father. The trial court allowed the defense a remedy for its discovery violation that still allowed it to present its theory, and it allowed the defense to question Junior extensively from the letters in order to provide the defense with the opportunity to present its theory of the murder. In fact, trial counsel read exact quotes from the letters in many instances. The introduction of the actual letters themselves into

evidence at most raises a possibility that a juror could have been influenced by reading them. *See, e.g., Woods v. Johnson*, 75 F.3d 1017, 1026 (5th Cir. 1996) (noting that a trial error does not entitle one to habeas relief "unless there is *more* than a mere reasonable possibility that it contributed to the verdict").

Finally, the Court notes that Petitioner has never presented a State court with the argument that trial counsel performed ineffectively in failing to properly follow the rules. Under the exhaustion doctrine, she was required to argue counsel's ineffectiveness to the State court before attempting to introduce it here as additional grounds to prevail on her claim. *See Wilder v. Cockrell*, 274 F.3d 255, 259 (5th Cir. 2001) ("[W]here petitioner advances in federal court an argument based on a legal theory distinct from that relied upon in the state court, he fails to satisfy the exhaustion requirement."). Therefore, the Court will not consider the claim.

Petitioner has failed to demonstrate that the decision of the Mississippi Supreme Court with regard to this issue involves an unreasonable application of law or determination of fact, and this claim will be dismissed.

## III.  Denial of Jury Instruction

During the jury instruction conference, defense counsel Wood presented an instruction that provided that the jury should find Petitioner guilty of accessory after the fact if it found that she knew that Junior had killed Edward but provided law enforcement with untrue information in order to help Junior escape arrest or punishment. (*See* Trial Tr. Vol. 16, 929; SCP Vol. 4, 455). The judge refused the instruction as not founded on the evidence in the case. (Trial Tr. Vol. 16, 933). Petitioner challenged the denial of the instruction on direct appeal. *Byrom I*, 863 So.2d at 873-74. Citing to Miss. Code Ann. § 97-1-5, the court noted:

The elements of accessory after the fact are that: (1) a completed felony has been committed; (2) the accused concealed, received, relieved, aided, or assisted a felon, knowing that such person had committed a felony; and (3) such assistance or aid was rendered with the intent to enable such felon to escape or avoid arrest, trial, conviction or punishment after the commission of such felony.

*Id.* at 874-75. After noting that accessory after the fact is not a lesser included offense of capital murder, as the two are separate crimes, the court considered whether Petitioner was nonetheless entitled to a "lesser offense" instruction. *See id.* at 874. The court found that the record evidence demonstrated Petitioner's involvement in the crime prior to Edward's death, which made her a principal in the crime and precluded the grant of the instruction. *See id.* at 875-76.

On habeas review, Petitioner maintains that there was sufficient evidence presented at trial to support her contention that her confessions were made to keep her son from being charged with murder, and that the refusal of the instruction unconstitutionally limited the jury's options to acquit her or convict her of capital murder in violation of the precedent of *Beck v. Alabama*, 447 U.S. 625, 642-43 (1980). She argues that the Mississippi Supreme Court's decision fails to apply the authority in *Beck* and otherwise unreasonably determines the facts in light of the evidence presented at trial. She also maintains that her right to present a meaningful defense was violated by the court's refusal to grant the instruction.

At trial, the jury heard evidence that Junior admitted that he wrote a letter confessing to the murder, that he told his mother that he shot his father in anger, that he told his jail mate that there was no conspiracy, and that Petitioner appeared not to understand what he was talking about when he first went to the hospital on June 4 to tell his mother that "it was done." (*See*, *e.g.*, Trial Tr. Vol. 14, 674-90; 748-49). Evidence was presented that Junior had a history of violent behavior, a volatile relationship with his father, and that he argued with him the day of

the murder.  (*See id.* at 650-73; *see* also Trial Tr. Vol. 15, 791, 817).  Petitioner notes that Junior's statement to police on June 6 implicates Gillis, but not her, in the murder.  (*See id.* at 674-77).  Additionally, she notes that the forensic evidence showed that Junior could have been the murderer, as he had gunpowder on his hands, while there was no gunpowder on Gillis' hands or shirt.  (Trial Tr. Vol. 14, 699-700).  There was also testimony that Petitioner repeatedly told officers that her son had nothing to do with the murder and that she would take the blame.  (Trial Tr. Vol. 15, 861-62).

Petitioner argues that the totality of the evidence implicating Junior in the crime makes it probable that some jurors would believe that (1) Petitioner asked Gillis to murder Edward, but that Junior preempted it by shooting his father in anger; or (2) Petitioner made up the story about the conspiracy in order to protect her son.  Petitioner argues that either version would have corresponded to the accessory after the fact instruction that defense counsel requested and would have fulfilled *Beck*'s standard that a defendant is entitled to a lesser included offense instruction where she can show that contradicting evidence "leaves some doubt with respect to an element that would justify conviction of the capital crime."  *Beck*, 447 U.S. at 637.  She acknowledges that accessory after the fact is not technically a lesser included offense of capital murder but argues that the distinction between lesser included offense and simple lesser offense does not negate the *Beck* principle requiring an instruction on a lesser offense supported by the evidence, or the principle that a defendant has the right to present a meaningful defense.

Respondents argue that this claim was not presented to the State court in the context of a federal constitutional violation, and that it is therefore barred from federal habeas review.  They otherwise argue that Petitioner was not entitled to an accessory after the fact instruction based

upon the evidence presented or upon the applicable law, as it is not a lesser included offense to capital murder.

The parties do not dispute the Mississippi Supreme Court's determination that accessory after the fact is not a lesser included offense of capital murder. *See, e.g., Wilcher v. State*, 455 So.2d 727, 734 (Miss. 1984). *Beck* does not apply to lesser related offenses, and a trial court's failure to instruct on a lesser related crime violates no constitutional obligation. *Hopkins v. Reeves*, 524 U.S. 88, 90-91 (1998). Moreover, in this case, Petitioner's jury was not automatically required to impose the death penalty upon a finding that she was guilty of capital murder. Where the death penalty is not automatically linked to a conviction of capital murder, the federal Constitution does not require that states grant an instruction on a lesser related instruction, even if it is supported by the evidence. *Hopkins*, 524 U.S. at 97-98; *see also Howell v. Mississippi*, 543 U.S. 440, 443 (2005) (noting that Mississippi does not apply *Beck* where the jury has the option of life imprisonment, which is "a conclusion that finds some support in our cases. . ."). As no federal constitutional right is implicated by the refusal of the court to grant a lesser related offense instruction, the Court defers to the State court's interpretation of its law. *See Creel v. Johnson*, 162 F.3d 385, 391 (5th Cir. 1998). Petitioner has also not demonstrated that her right to present a meaningful defense was limited by the court's refusal to grant the instruction. Petitioner fails to demonstrate that habeas relief on this issue is warranted, and this claim will be dismissed.

## IV. Suppression of Exculpatory Evidence

Petitioner maintains that Junior's confession to Dr. Lott is exculpatory evidence that was never disclosed to defense counsel, and that this evidence would have both refuted the State's

theory of murder-for-hire and undermined Junior's credibility at trial. She also maintains that the State allowed Junior to testify falsely on the witness stand after knowing that he confessed to Dr. Lott. The prejudice that flowed from this violation is apparent, she argues, based upon the fact that the State offered Gillis a plea bargain rather than attempt to secure Gillis' conviction with Junior's unreliable testimony.[19] Petitioner concedes that she has not presented the State court with her claim that Dr. Lott's report was improperly withheld.

The trial court judge appointed the same psychologist to evaluate all three co-defendants and ordered the psychologist to submit all three evaluation reports to the trial court. While this procedure raises legal and factual concerns circuitously relevant to several of the allegations of error raised in the instant petition, its alleged prejudicial effect is directly relevant to the Court's consideration of this claim. However, this Court does not review allegations that were never presented to the State courts where Petitioner had the opportunity and the means to know of these issues during the State courts' proceedings. *See, e.g., Cullen v. Pinholster*, 131 S. Ct. 1388, 1401 (2011). Therefore, this claim is barred from federal habeas review. *See, e.g., Gray v. Netherland*, 518 U.S. 152, 166 (1996); *Ogan v. Cockrell*, 297 F.3d 349, 358 (5th Cir. 2002). As the Court has already determined that Petitioner's claim of innocence is insufficient to provide the Court with a gateway to review this claim, Petitioner must demonstrate the requisite cause and prejudice to obtain federal habeas review. *See id.*

*Brady v. Maryland* requires that the prosecution disclose evidence in its possession that is "materially favorable to the accused." *Youngblood v. West Virginia*, 547 U.S. 867, 869 (2006);

---

[19] The Court notes that Gillis pled guilty to accessory after the fact to capital murder and conspiracy to commit capital murder. (Pet. Ex. 1).

*Brady v. Maryland*, 373 U.S. 83, 87 (1963).  Petitioner's claim imputes knowledge to the State

based upon a statement attributed to the Assistant District Attorney about the Gillis proceedings in

March 2001.  One newspaper quotes him as stating that the prosecution learned, "[w]hile

preparing for the Gillis trial," that Junior made "another conflicting statement to his psychologist"

and that those statements could have "'seriously compromised' [Junior]'s future testimony against

Gillis."  (Pet. Ex. 7-A).  Another notes that he said that Junior had made "conflicting statements

about what happened" when testifying against Petitioner, and that the State had learned while

preparing for Gillis' trial, "he also made a conflicting statement to a psychologist."  (*See* Pet. Ex.

7-B).  These statements not only acknowledge that Junior gave conflicting statements at trial, but

the very language of the quotes indicate that the conflicting statements made by Junior to Dr. Lott

were not made known until the prosecution began preparations for Gillis' trial.  Given the trial

judge's ruling in all three cases that the reports would be reviewed *in camera* and released to the

State only upon court order, there is no reason for the Court to assume that the State was provided

a complimentary copy of the report in Junior's case, much less Petitioner's case.  (*See*, *e.g.*, SCP

Vol. 1, 107).  Rather, it would appear from the evidence presented that the prosecution became

aware that Junior made statements to Dr. Lott only when Gillis' attorney informed the Assistant

District Attorney of that fact in March 2001.  (*See*, *e.g.*, Pet. Ex. 61-1, Ltr. from Atty. Thomas

Comer, March 12, 2001).[20]

Also, Petitioner knew of the alleged statements Junior made to Dr. Lott during her direct

appeal.  Petitioner's direct appeal brief was filed on November 16, 2001, and it references the

---

[20] In the letter, Comer states his intention to call Dr. Lott to testify that Junior stated that
Junior killed his father and that Gillis helped him hide the gun.

allegation.  (*See* Pet. Direct Appeal Br. 9, 16).[21]  The transcript of the oral argument held on

Petitioner's appeal before the Mississippi Supreme Court on December 4, 2002, also references

the parties' knowledge and the court's knowledge that Junior might have made an admission to

Dr. Lott.  (Pet. Ex. 15 at 37).  That transcript also indicates the State's belief that Junior did not

make the alleged statements until after Petitioner's trial.[22]  Therefore, from the statements in front

of the Court, it appears uncertain that the alleged statements were even made at the time of

Petitioner's trial.  Even if the alleged statements were made contemporaneously with preparations

for Petitioner's trial, however, the record supports a determination that the State did not become

aware of them until March 2001.

Moreover, this information was known at the time of Petitioner's direct appeal and post-

conviction review, and yet Petitioner did not present this readily available evidence in support of

her claim.  Petitioner has failed to demonstrate cause for her failure to do so, and she has not

shown prejudice.  The Court makes no conclusion about what Dr. Lott's report concerning Junior

contains or whether it should have been given to defense counsel if it was in existence at the time

of her trial.  However, Junior was confronted at trial with similar admissions that he made to

various people, and he admitted that he told some people that he alone shot his father.  (*See*, *e.g.*,

Trial Tr. Vol. 14, 686-90, 748-50; Trial Tr. Vol. 15, 751-54).  In order for evidence to be material

under the *Brady* standard, the omitted evidence must create a reasonable doubt that otherwise did

---

[21] The allegation was not raised as an independent claim. (*See* Pet. Direct Appeal Br. 15-17).

[22] This would be consistent with what federal habeas counsel maintains is Dr. Lott's own recollection of the events, although habeas counsel argues that the orders in the consolidated pretrial proceedings in the case almost assure that the examinations of all three defendants were conducted simultaneously.  (*See* Reply Ex. 5).

not exist. *See Graves v. Cockrell*, 351 F.3d 143, 153-54 (5th Cir. 2003) (*citing United States v. Agurs*, 427 U.S. 97 (1976)).[23]

Petitioner has also failed to demonstrate that the State allowed Junior to testify falsely. Both parties were aware that Junior had made contradictory statements, and he did not ultimately repudiate his trial testimony. When he did ultimately plead guilty, it was to the substance of what he testified to at Petitioner's trial. (*See* PCR Ex. 10). Petitioner has failed to demonstrate cause and prejudice for failing to present this claim to the State court for review. Additionally, even if Junior did confess prior to Petitioner's trial that he alone killed Edward, and even if the State was in possession of that knowledge and failed to disclose it to defense counsel, Petitioner has failed to demonstrate that it is evidence that would have created an otherwise nonexistent reasonable doubt as to her guilt. Petitioner is not entitled to relief on this claim.

## V. Involuntary Statements & Privilege Against Self Incrimination

Following her husband's murder, Petitioner gave statements to police at (1) 8:38 p.m. on June 4; (2) 10:47 p.m. on June 4; (3) 6:53 a.m. on June 5; (4) 9:00 a.m. on June 6; and (5) 3:03 p.m. on June 7. Petitioner incriminated herself in her husband's murder in the last four statements, and all of the statements, with the exception of the last one, were taken while Petitioner was hospitalized. The trial court held a suppression hearing to determine whether the prosecution would be allowed to introduce the incriminating statements, and while the court found Petitioner's first two self-incriminating statements inadmissible because of law

---

[23] The Court notes that Petitioner must also demonstrate that the non-discovery of the allegedly impeaching or exculpatory evidence was not the result of a lack of due diligence. *See Graves*, 351 F.3d at 153-54. As the newspaper article giving rise to this claim was published in 2001, before Petitioner's direct appeal was filed, the basis of this claim was available during Petitioner's State court proceedings.

enforcement's failure to adequately inform Petitioner of her *Miranda*[24] rights, it ultimately found the last two statements admissible. (Trial Tr. Vol. 11, 278-82). Petitioner argues that all of the statements should have been suppressed as (1) the police coercion in her initial statements carried over and rendered the subsequent statements involuntary; and (2) even voluntarily made, the subsequent statements were not admissible because the initial interrogation in the absence of valid *Miranda* warnings prevented the later warnings from operating effectively.

According to the report of Dr. Keith A. Caruso, the psychiatric expert defense counsel obtained at trial, and the affidavit of Dr. Anthony J. Verlangieri, a professor of pharmacology and toxicology who was asked by federal habeas counsel to review records in this case, Petitioner was receiving twelve different medications at the time she was interrogated at 10:47 p.m. on June 4, 1999. These medications included sleeping pills, muscle relaxers, and pain medication. (Pet. Ex. 9, Aff. of Dr. Verlangieri; Reply Ex. 6, Decl. of Dr. Caruso). She had also been given an injection of Librium at 4:50 p.m., and the nurses were under orders to administer the injection every four hours if Petitioner needed it.[25] (*See* ECF No. 64-1)[26]. Dr. Caruso evaluated Petitioner in October

---

[24] In *Miranda v. Arizona*, 384 U.S. 436, 479 (1966), the Supreme Court held that the privilege against self-incrimination requires that law enforcement officials inform a suspect in custody of his (1) right to remain silent; (2) that any statement he makes may be used against him in court; and (3) that he has the right to retained or, if he cannot afford to retain, appointed counsel present before being questioned. *Miranda v. Arizona*, 384 U.S. 436, 479 (1966). A statement made during a custodial interrogation that lacks these warnings must be suppressed. *Oregon v. Elstad*, 4790 U.S. at 307. These rights may be waived if the waiver was knowing, intelligent, and voluntary under the totality of the circumstances. *Miranda,* 384 U.S. at 475.

[25] Librium is generally prescribed to relieve anxiety and to control agitation caused by alcohol withdrawal. *See, e.g,* Harold L. Kaplan & Benjamin J. Saddock, *Synopsis of Psychiatry: Behavioral Sciences/Clinical Psychiatry* 399 (8th ed. 1998).

[26] The Court notes that, although records from Dr. Kitchens were filed as a trial exhibit by the defense in this case, there are no records from June 1999 in the trial record. The Court has

2000 in anticipation of trial, and his report states that Petitioner suffered from recurrent and severe depression, alcohol dependence, Munchausen's Syndrome, an adult history of physical abuse, lupus, pneumonia, anemia, Factor X deficiency, hypertension, fibromyalgia, and chronic headaches and back pain at the time of the offense. (*See, e.g.*, Reply Ex. 6, Ex. C).

At 8:38 p.m. on June 4, Officer Ricky Marlar interviewed Petitioner, who was not then a suspect, regarding her knowledge of firearms in the home. (*See* Trial Tr. Vol. 10, 136-150; Trial Tr. Vol. 11, 151-53). Officer Marlar also wanted to question Petitioner about the relationship between her husband and her son, as he suspected that Junior was involved in the murder. (Trial Tr. Vol. 10, 138). Before he spoke to Petitioner, he spoke to Anna Southward, the registered nurse on duty at the time, regarding whether Petitioner was medicated in a manner that would affect her understanding. (*Id.* at 148). Nurse Southward was also present when Petitioner was being questioned, and Officer Marlar did not think that Petitioner's ability to understand was inhibited during the interview. (*Id.* at 139; Trial Tr. Vol. 11, 153). Officer Marlar read Petitioner her *Miranda* rights off of a wallet card. (*Id.* at 140). He advised Petitioner:

> Before we ask you any questions you must understand your rights. You have the right to remain silent. Anything you say can and will be used against you in a court or other proceedings. You have the right to have an attorney present during any interrogation. If you cannot afford an attorney and so desire, one will be appointed for you prior to any questions. Do you understand these rights? Do you wish to talk to us at this time?

(*Id.* at 140). After satisfying himself that Petitioner understood the rights and obtaining a waiver from her, he proceeded to question her. (*Id.* at 140-41). He wrote out the statement she gave, and she signed it. (*Id.* at 138-39).

_____

since expanded the record in this case to include Petitioner's June 1999 medical records. (*See* ECF No. 65).

On the same evening, Junior was taken from the Byrom home by law enforcement officers. First, he was taken for a gunpowder residue test, and then he was taken to the Sheriff's Department to wait until Sheriff Smith arrived to question him. The Court notes that there is inconsistency in the reports of the law enforcement officials as to whether Junior was interviewed before Petitioner was interviewed. Officer Marlar's written report suggests that Junior was interviewed first, but that as he did not consider her a suspect at the time, Junior obviously did not implicate Petitioner in the crime during that initial interview. (*See, e.g.,* Trial Tr. Vol. 10, 142-43). However, Deputy Edmondson and Sheriff Smith interviewed Junior at the Sheriff's Office on June 4, and both men state that Junior indicated his mother's involvement in the crime prior to them interviewing her at 10:47 p.m. on June 4. (Trial Tr. Vol. 11, 155, 161-62, 241-44).[27] The transcript on the 10:47 p.m. interrogation contains references to facts Sheriff Smith would not have known absent having spoken to someone with knowledge of the family, however, so it is reasonable to conclude that Junior was, in fact, interviewed first. (*See, e.g.*, SCP Vol. 3, 338). Although there was testimony that the officers believed that Junior's interview was being tape recorded, no actual recording was made. (*See* Trial Tr. Vol. 11, 172).[28]

After speaking to Junior, Sheriff Smith and Deputy Edmondson went to the hospital and

---

[27] The Court found only one indication in the reports as to the timeline of events. Deputy Pannell's statement indicates that the officers did not leave the crime scene to return to the Sheriff's Office until approximately 10:10 p.m. on June 4. (*See* SCP Vol. 3, 418-19). It is clear from the reports that Officer Edmondson and Officer Marlar took Junior to have a gunpowder residue test performed on his hands. (*See id.* at 415, 417, 418). Edmondson then transported Junior to the Sheriff's Office and sat with him until Sheriff Smith arrived. (*See, e.g., id.* at 417).

[28] Sheriff Smith again spoke to Junior after the 10:47 p.m. interview with Petitioner. (*See* Trial Tr. Vol. 11, 258). Junior also gave a subsequent statement to police which was recorded and transcribed. (*See* State Trial Ex. 69).

conducted an interview with Petitioner at 10:47 p.m.  Sheriff Smith stated at the suppression

hearing that Dr. Kitchens indicated that Petitioner's medications would not prevent her from

understanding questions or responding appropriately thereto.  (*Id.* at 159).  Dr. Kitchens and

Nurse Southward were present during the interview.  (*See id.*).  Sheriff Smith first inquired

whether Petitioner had her rights read to her previously that day.  (*See* SCP Vol. 3, 338).

Petitioner stated that she had been previously read her rights.[29]  Sheriff Smith informed her:

> DS: Ok.  I'm going to say them to you again.  You have the right to remain silent.
> Anything you say can and will be held against you in a court of law.  If [y]ou can't
> afford an [a]ttorney, one will be appointed for you.  If you decide that you do want
> to answer questions, you do have the right to stop at any time.  Do you understand
> your [r]ights?
> MB: Yes.

(SCP Vol. 3, 338).  Almost immediately thereafter, Sheriff Smith told her that there was "a

problem" and that Junior "went ahead and told [Sheriff Smith] everything."  (SCP Vol. 3, 338).

When Petitioner asked what Junior said, Sheriff Smith told her that Junior stated that he and his

mother were tired of the regular beatings, the last of which occurred when Petitioner and Edward

came home from the Key West Inn, and that she told Junior to find someone to "send" to her.  (*Id.*

at 338).  He additionally said that Junior confessed that he sent two or three people, but that Junior

did not know which person Petitioner hired.  (*Id.*).  Sheriff Smith said that he had already gotten a

statement from Junior, and that Petitioner should not "let him be out here by himself on this."

(*Id.*).  When Petitioner continued to deny any knowledge of what Sheriff Smith was talking about,

Smith said that she was "trying to leave [Junior] out there by himself."  (*Id.* at 339).  Sheriff Smith

---

[29] One transcript of this interview contains a typographical error as confirmed by
Petitioner's audible responses on the tape recording.  The transcript should read that she
confirmed that her rights had been read to her previously.  (*See* Trial Tr. Vol. 11, 157-58).

told her that he knew it would be the most difficult thing that she had ever done, but that she needed to identify the other "boys" involved so that Petitioner and Junior would not be in danger. (*Id.* at 340). Immediately thereafter, Petitioner told the officers that she had talked to a "boy named Joey." (*Id.*). Sheriff Smith again indicated that Petitioner was being evasive, as Junior had already talked, and that Junior told them that about a week prior to the murder that Petitioner stated that "it was fixing to happen." (*Id.*). When she denied telling Junior that, Sheriff Smith told her that they would be able to pull together enough statements to prosecute and not to leave Junior "to bite the big bullet" by himself. (*Id.*). Petitioner said that she would not let that happen, and that she would take full responsibility. (*Id.*).

Sheriff Smith reminded her that she would be in danger if law enforcement failed to arrest the triggerman. (*Id.* at 341). After more questioning, Sheriff Smith stated that she was leaving out details, and that her cooperation would matter when he spoke to the judge. (*Id.* at 344). Sheriff Smith told her that he would have to tell the judge that Petitioner had memory lapses and they had to "pick it out of her," which the judge would not like. (*Id.*). Within a few more questions, she identified the person she had hired, which was Gillis. (*Id.* at 345). By the time that Sheriff Smith concluded the interview at 11:13 p.m., Petitioner had been placed in custody. (*See id.* at 346-47).

Sheriff Smith stated that he believed that Petitioner understood her rights and voluntarily waived them, particularly as they had been read earlier by Officer Marlar. (Trial Tr. Vol. 11, 159-60). He admitted that, as part of his strategy to get Petitioner to talk, he told her not to leave Junior "to bite the big bullet" and that the judge would ask whether she cooperated. (*Id.* at 165-66). At the suppression hearing, Sheriff Smith said he gave Petitioner *Miranda* warnings from

memory, and that he inadvertently omitted from the warnings her right to an attorney before and during questioning.  (Trial Tr. Vol. 11, 164; s*ee*  also SCP Vol. 3, 338).

Petitioner's third interview occurred at 6:53 a.m. on June 5.  Sheriff Smith questioned Petitioner to determine her knowledge of how the crime was actually committed.  (*See*, *e.g.*, State Trial Ex. 4; SCP Vol. 3, 348-351). [30]  Petitioner's *Miranda* rights were not read to her before questioning began.  At the conclusion of the eleven minute interview, Smith asked her whether her rights had been read to her previously.  (*See id.*).  At the suppression hearing, Sheriff Smith stated he felt at the time as though Petitioner knew and understood her rights.  (*Id.* at 186-87).

On June 6, 1999, Petitioner was once again questioned by Sheriff Smith.  (*See* State Trial Ex. 5).  At the beginning of the interview, Smith stated:

> DS: Before we ask you any questions, you must understand your rights:  You have the right to remain silent.  Anything you can and will be used against you in a court or other proceedings.  You have the right to have an attorney present during any interrogation.  If you cannot afford an attorney,[] and so desire, one will be appointed for you prior to any questioning.  If you choose to answer questions or make a statement, you have the right to stop at any time.  Do you understand your rights?
> MB:  I understand.
> DS:  Are you willing to go ahead and talk to us again?
> MB:  Oh, yes.

(SCP Vol. 3, 352; *see also* Trial Tr. Vol. 11, 187).  In this interview, Petitioner was again questioned about her knowledge of anyone else's involvement in the crime.  She provided the officers details about how she intended to pay Gillis, along with details of the prior failed attempts to shoot Edward.  (*See id.*).[31]

---

[30]Officers Rodney Pannell and Donnie Edmondson were also present.

[31] Deputy Edmondson testified that he was present during the interview.  (*See* Trial Tr. Vol. 11, 252-53).

Petitioner's final interview was conducted by Ralph Dance, a criminal investigator with the District Attorney's office, at 3:03 p.m. on June 7, 1999, at the Tishomingo County Sheriff's Department.  (*See* SCP Vol. 3, 369; State Trial Ex. 6).[32]   The transcript states:

> [RD:] Ms. Byrom, we are here to ask you a few questions, but before we do, I know your rights have been read to [you] on several occasion[s], I [am] sure, since all of this took place, is that correct?
> MB: Yes.
> RD: I'm going to read them to you again.  Before we ask you any questions, you must understand your rights: You have the right to remain silent.  Anything you say can and will be used against you in a court or other proceedings.  You have the right to have an attorney present during any interrogation.  If you cannot afford an attorney, and so desire, one will be appointed for you prior to any questioning.  If you choose to answer questions or make any statement, you have the right to stop at any time.  It says, I, Michelle Byrom, have had read to me my rights and I fully understand my rights.  Do you understand everything I've read to you there?
> MB: Yes.
> RD: I'm going to go ahead and read to you a Waiver of Rights. [T]his is saying you agree to talk to us at this time.  To my understand you've already talked to them.
> MB: At anytime I'm allowed to bring in my attorney?
> RD: That's your options.  I will read this to you and it will explain it to you. It says. . . [that Michelle Byrom has been informed of the above cited rights].  I fully understand those rights.  I wish to waive those rights and agree to answer questions and/or make a statement.  I do voluntarily.  There have been no promises or threats made to me.  This you can do at your own free will, do you understand all that? Do you want to talk to us at this time?
> MB: Yes.
> RD: Are you willing to talk to us at this time?
> MB: Yes.

(SCP Vol. 3, 369; State Trial Ex. 6).  Petitioner executed the waiver of rights and gave a statement recounting her knowledge of the plan to murder Edward, as well as the physical and sexual abuse Edward inflicted upon her.  (*See id.*).  Investigator Dance testified at the suppression hearing that he believed that she fully understood what was happening and was fully competent at the time.

---

[32] Officers Pannell and Bobby Flynt were also present during the interview.  (*See* State Trial Ex. 6).

(Trial Tr. Vol. 11, 212). Petitioner testified at the suppression hearing that she did not remember much of anything about the interviews, as she was under the influence of numerous medications at the time she was hospitalized. (*See* Trial Tr. Vol. 11, 225-227).

The trial court ultimately found the June 4 statement inadmissible because of defective *Miranda* warnings and the June 5 statement inadmissible because of the absence of the warnings. (Trial Tr. Vol. 11, 278). It found that the rights as stated by Sheriff Smith on June 6, however, sufficiently advised Petitioner of her rights. (*Id.* at 281-82). The court noted that Petitioner had been read her rights on two previous occasions, one of which was the "classic, standard" *Miranda* advice, such that she was not operating "in a total vacuum" at the time the rights were read by Sheriff Smith on June 6. (*Id.*). The trial court also rejected Petitioner's challenge to the June 7 statement, finding that Investigator Dance's recitation involved the classic warning. (*Id.* at 282-84). At trial, Petitioner's statements on June 6 and June 7, 1999, were played for the jury. (*See*, *e.g.*, Trial Tr. Vol. 15, 852, 878). The jury was later instructed on how to view any discrepancies between the tapes and the transcripts. (*See id.* at 878).

On direct appeal, Petitioner argued that the trial court erred in failing to grant her motion to suppress the statements she gave to law enforcement officials on June 6 and June 7, 1999. *See Byrom I*, 863 So.2d at 855-861. She maintained that the June 6 statement was inadmissible due to the defective *Miranda* warnings given, and that the June 7 statement was not freely and voluntarily given. *See id.* at 855-56.[33] The court rejected Petitioner's claim, finding that

---

[33] Petitioner also made an argument concerning the burden of proof at the suppression hearing on direct appeal, which she does not make here. *See id.* at 857-58. She also argued that the letters written between Junior and her should have been excluded as the fruit of the poisonous tree, which she does not assert in federal habeas. *Id.* at 859-860.

Petitioner could not have misunderstood her rights during the June 6 interview, and that the statement was merely cumulative of the June 7 statement in which she was given the classic warnings and executed a written waiver of rights. *Id.* at 858. Any error that stemmed from the admission of the June 6 statement was harmless, the court found, as some variation of rights had been given to Petitioner twice prior to the June 6 warnings. *Id.*

Relying upon the Supreme Court case of *Oregon v. Elstad*, 470 U.S. 298, 316-18 (1985), the court also rejected Petitioner's claim that the prior unconstitutional interrogations affected the admissibility of the properly warned statements, as well as her claim that Sheriff Smith threatened and deceived her during interrogations. *Id.* at 858-61. The court found that Petitioner had failed to demonstrate that the June 6 and June 7 statements were obtained by any exploitation of the earlier statements, and that the evidence showed that she knowingly waived her rights after being clearly advised of them. *See id.* at 859. The court noted Petitioner's argument that Sheriff Smith made statements threatening Junior with prosecution and promising leniency to her if she cooperated with law enforcement, but determined that these statements were of no consequence, as the sheriff's comments were made in statements that were excluded. *Id.* at 860. It otherwise found no prejudice to Petitioner as a result, as she had already confessed her involvement and Junior's involvement in the crime prior to the comments. *Id.* at 861. Additionally, the court noted that the questioning produced no result, as Petitioner did not reveal the identity of anyone else that might have been with Gillis at the time of the murder, which is what the questioning was intended to produce. *Id.*

The Court first considers Petitioner's claim that the absence of valid *Miranda* warnings in her initial interrogation prevented the subsequent warnings from being effective. She argues that

the Mississippi Supreme Court failed to apply the correct precedent to her claim, and that it otherwise applied the law in an unreasonable manner, such that she is entitled to relief on this claim. The Court's consideration of this claim is particularly guided by two Supreme Court cases, *Oregon v. Elstad*, 470 U.S. 298 (1985) and *Missouri v. Seibert*, 542 U.S. 600 (2004). In these cases, the United States Supreme Court addressed situations where a suspect in custody confessed without having received a *Miranda* warning and then, after being given a *Miranda* warning, confessed again. In *Elstad*, a suspect made a self-incriminating statement while at his home during a robbery investigation, and once he was taken to the police station and given *Miranda* warnings, he made a second statement. *See* 470 U.S. at 300-01. He attempted to suppress the postwarning confession. The Court found that "there is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda*, was voluntary." *Id.* at 318.

In *Seibert*, the police followed a departmental policy of deliberately withholding *Miranda* warnings in order to elicit a confession from the suspect, and then giving the warnings and obtaining a waiver prior to eliciting a second confession. *Seibert,* 542 U.S. at 609-10. The plurality found that the issue is whether the midstream *Miranda* warning allowed it to effectively function, which required that the warning serve to advise the suspect that he had a real choice as whether to give a statement. *See id.* at 611-12. Justice Kennedy, who wrote a concurrence and provided the fifth vote in the case, determined that the statements from the second interrogation are inadmissible if "the two step interrogation was used in a calculated way to undermine the *Miranda* warning." *Id.* at 622 (Kennedy, J., concurring).

There is a federal circuit split regarding whether the plurality test or the "deliberate two-

step strategy" test in Justice Kennedy's concurrence controls. *See, e.g., United States v. Capers*, 627 F.3d 470, 476 (2nd Cir. 2010) (noting that the Second, Third, Fifth, Ninth, and Eleventh Circuits apply Justice Kennedy's approach in *Seibert*). The Fifth Circuit follows the Kennedy approach. *See United States v. Nunez-Sanchez*, 478 F.3d 663, 668 n.1 (5th Cir. 2007) (finding *Seibert*'s holding in Kennedy's concurrence as it provided the fifth vote for the plurality and was decided on narrower grounds); *United States v. Courtney*, 463 F.3d 333, 338-39 (5th Cir. 2006) (adopting concurring opinion in *Seibert*). Therefore, in the absence of evidence that a two-step strategy was deliberately employed, the *Elstad* rule applies, which provides that "a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." 470 U.S. at 318.

There is no reason to assume that law enforcement acted with a nefarious intent and deliberately withheld effective *Miranda* warnings in this case. On June 4, Sheriff Smith consulted Petitioner's physician prior to questioning her, and he had Dr. Kitchens and a nurse present for the questioning itself. Moreover, Petitioner was classically advised of her rights by Officer Marlar a few hours before Sheriff Smith asked her if she had been read her rights. Though she answered affirmatively, Sheriff Smith attempted to administer the rights a second time prior to asking her any questions. The fact that he omitted from his recitation her right to consult counsel prior to questioning, in light of all of the other circumstances, demonstrates inadvertence more than it does an attempt to deliberately bypass Petitioner's rights. Sheriff Smith states in the transcript of the June 5 interrogation that he forgot to administer the warnings at the beginning of the interview, and Petitioner indicates that her rights had previously been read to her. In the June 6 and June 7

statements, Petitioner was immediately given *Miranda* warnings before any questioning began. Moreover, Petitioner was questioned on subsequent days as the investigation progressed, and not immediately properly warned after she made her first incriminating statement with absent or improper warnings. Petitioner has not demonstrated that law enforcement officials deliberately withheld *Miranda* warnings to gain a tactical advantage. Therefore, the Court does not find that the Mississippi Supreme Court's decision failed to identify and apply the proper standard, which is the voluntariness rule of *Elstad*. *See Nunez-Sanchez*, 478 F.3d at 668 (where two-step strategy is not used, admissibility of postwarning statements governed by *Elstad*).

Petitioner maintains that the coercion present in the initial interrogations deprived her of any real choice as to whether to continue speaking to police during the later interrogations, thereby rendering the subsequent confessions involuntary. She argues that the Mississippi Supreme Court unreasonably applied *Elstad* in determining that it was moot to argue that the sheriff's remarks in the improperly warned interrogation influenced Petitioner's remarks in the subsequent interviews. The Mississippi Supreme Court also found that Petitioner failed to "prove that the admitted statements were obtained by exploiting the excluded statements. Rather, it is clear from the totality of the circumstances that [Petitioner] was advised of her rights on numerous occasions and that she understood and knowingly waived those rights." *Byrom I*, 863 So.2d at 859. Under *Elstad*, there is no requirement that the trial court exclude Petitioner's properly warned confessions if there was no police coercion in the initial interrogations that carried over into the subsequent confessions. *See Elstad*, 470 U.S. at 318 ("There is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda*, was voluntary.").

Whether a confession was obtained in violation of a defendant's rights under the Due Process Clause is an inquiry courts consider under the totality of the circumstances. *See Withrow v. Williams*, 507 U.S. 680, 693 (1993). While factors such as "the length of the interrogation, its location, its continuity, the defendant's maturity, education, physical condition, and mental health" are all relevant, "coercive police activity is a necessary predicate" of a determination that a confession was not voluntary. *Id.*; *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). Petitioner argues that her initial statements were coerced because at the June 4 interview (1) she was hospitalized with double pneumonia and heavily medicated; (2) the sheriff urged her to confess to protect her son from prosecution; (3) the sheriff falsely told her that Junior had already confessed; and (4) the sheriff indicated her level of cooperation would be communicated to the trial judge. Additionally, she maintains that the sheriff followed up on some of Petitioner's statements in his June 5 interview, and that he began suggesting that she intended to use life insurance proceeds to pay Gillis, thereby fishing for aggravating factors to support the death penalty. She argues that the court's decision failed to properly apply the law on voluntariness, and it unreasonably determined facts in light of the evidence.

The Court's inquiry is whether the inculpatory statements made by Petitioner on June 4 and June 5 were the product of police coercion. If they were not, then under *Elstad*, there is no reason for the Court to presume a coercive effect with regard to the properly warned statements. *See Elstad*, 470 U.S. at 318. If they were the result of police coercion, the Court must consider whether the coercion carried over into the June 6 and June 7 statements. *See, e.g., Elstad*, 470 U.S. at 310 (whether second confession insulated from earlier, tainted confession depends on a number of factors). After considering the totality of the circumstances in this case, the Court finds

that Petitioner has not demonstrated that the decision of the Mississippi Supreme Court warrants relief.

Petitioner's claim that her physical condition and medication regimen at the time she was questioned resulted in involuntary statements is, to the extent it is independently raised, barred from federal habeas review because it was never presented to the State courts.  *See Whitehead v. Johnson*, 157 F.3d 384, 387 (5th Cir. 1998) (the claim made in federal habeas must be the "'substantial equivalent' of one presented to the state court to satisfy the "fairly presented" requirement).  However, the circumstances of Petitioner's confession, which includes that she was hospitalized with double pneumonia and medicated at the time of the obtained statements, are relevant to whether the statements were voluntarily given.  *See, e.g., Winthrow*, 507 U.S. at 693-94.  Sometime subsequent to the initiation of her habeas proceedings, Petitioner secured the assistance of Dr. Verlangieri to review various medical and trial records in her case.  (*See* Pet. Ex. 9).  Dr. Verlangieri opines that there is a reasonable probability that Petitioner's decision-making abilities were impaired at the time she gave a statement to law enforcement.  (*See id.*).  However, law enforcement officials in this case consulted with Petitioner's own personal physician on June 4 and received his clinical opinion that Petitioner's ability to understand and answer would not be adversely effected by the medications she had been given.  At the suppression hearing, Sheriff Smith, Deputy Edmondson, and Officer Marlar all testified that Petitioner appeared coherent and appeared to understand what was transpiring during the interviews on June 4.  (*See* Trial Tr. Vol. 10, 139; Trial Tr. Vol. 11, 153, 159, 250-51).  The record evidence supports a determination that all of the law enforcement officers present, as well as Petitioner's physician and the nurse on duty, believed her to be able to freely understand and comprehend the inquiries posed to her on June 4,

1999. Dr. Verlangieri's conclusion, on the other hand, comes years after the fact and is based solely upon his review of documents.

Petitioner has failed to demonstrate that Sheriff Smith falsely told Petitioner during the June 4 interview that Junior had already confessed. First, the Court notes that even if Petitioner could demonstrate that the sheriff misled her, a misrepresentation of the evidence is insufficient to make an otherwise voluntary confession inadmissible. *Frazier v. Cupp*, 394 U.S. 731, 739 (1969) (holding interrogator's misrepresentation to suspect that his co-suspect had already confessed did not render suspect's subsequent confession involuntary). Moreover, there is sufficient record evidence to make it a reasonable conclusion that Junior did in fact give an inculpatory statement to law enforcement prior to Petitioner's 10:47 p.m. interview on June 4. Sheriff Smith testified at the suppression hearing that he spoke to Junior first, and that Junior told him that his mother would know who murdered his father. (*See* Trial Tr. Vol. 11, 161-62). Deputy Edmondson testified to the same. (*Id*. at 242-43). As stated earlier, the information relayed from Sheriff Smith to Petitioner during the June 4 interview regarding what Junior said suggests that Smith had spoken to Junior prior to his interview with Petitioner. (*See, e.g.*, SCP Vol. 3, 338).

Additionally, Petitioner's allegation that the June 5 interrogation was instigated in order for the sheriff to gather facts in support of an aggravating factor, i.e., that she was going to pay Gillis for the murder, is not a reasonable conclusion from a review of the transcripts. Sheriff Smith learned during the June 4 interview that Petitioner offered Gillis money so that he could go to Florida in exchange for Edward's murder. (*See* SCP Vol. 3, 342-43). While Petitioner may have denied at that time that she was going to get the money out of the life insurance proceeds, it does not change the character of the exchange, which was a murder in exchange for something

Gillis wanted.  By the end of the interview on June 4, Petitioner had confessed that she had hired

Gillis to kill her husband.  The subsequent interrogations did not significantly alter any facts

relevant to her guilt, but rather, fleshed out more details of the planning and execution of the

crime.  (*See* SCP Vol. 3, 348-85).

The bulk of Petitioner's argument against the voluntariness of her later confessions is her

allegation that Sheriff Smith coerced her first inculpatory statement on June 4 by urging her to

admit her own involvement in the crime in order to protect Junior.  Specifically, she notes that the

Sheriff told her no less than three times during the interview that she was leaving Junior "by

himself" and that he would "bite the big bullet" unless she confessed her involvement.  (*See, e.g.,*

SCP Vol. 3, 339-40).  Petitioner argues that the facts of her case are like those in *Lynumn v.*

*Illinois*, 372 U.S. 528 (1963), where the Supreme Court found involuntary the confession of a

suspect who was told she would lose her welfare benefits and custody of her children if she did

not confess.  However, Petitioner's circumstances were markedly different than the situation in

*Lynnumn*.  In *Lynnumn*, the suspect was being threatened with the loss of rights and benefits that

the police had no authority to restrict and that were unrelated to the crime for which she was being

questioned.  *See id.* at 534.  The record demonstrates that when the interview with Petitioner

began on June 4, Sheriff Smith identified the persons present, administered the *Miranda* warnings

previously noted, and then told Petitioner what Junior had said about the murder.  (*See* SCP Vol.

3, 338).  By the time Petitioner was interviewed, Junior had already informed law enforcement of

his own involvement in the murder and told them that a third person was involved.  (*See id.*).  In

short, Sheriff Smith confronted Petitioner with the facts as police understood them up to that point

in the investigation rather than misrepresent his authority to act in an attempt to invoke in

Petitioner some otherwise unwarranted fear.[34]

Additionally, the Court does not find that it was unreasonable to determine that the Sheriff's remarks about Petitioner's perceived level of cooperation were not prejudicial. By the time Sheriff Smith alluded to the fact that Petitioner might receive some benefit for cooperating, she had already confessed that she offered a boy named Joey some money to kill her husband. (*See* SCP Vol. 3, 344). Therefore, Petitioner has not demonstrated that the sheriff's comment, even if improper, resulted in her confession. *See Hopkins v. Cockrell*, 325 F.3d 579, 584 (5th Cir. 2003) (finding there must be a link between the coercive conduct and the confession in order to demonstrate that a confession was involuntary).

The Mississippi Supreme Court found that "it is clear from the totality of the circumstances that [Petitioner] was advised of her rights on numerous occasions and that she understood and knowingly waived those rights." *Byrom I*, 863 So.2d at 859. Petitioner has failed to demonstrate that, under the totality of the circumstances, her statements were involuntary. Petitioner was undisputedly properly given *Miranda* warnings by Officer Marlar approximately two hours before Sheriff Smith interrogated Petitioner on June 4. Sheriff Smith spoke with Petitioner's doctor prior to questioning her, and her doctor was present in the room for questioning. After giving an introductory statement as to who was present, the date, and the time,

---

[34] Petitioner also claimed that the Mississippi Supreme Court made an unreasonable determination of facts in finding that Petitioner had already implicated herself and Gillis by the time Sheriff Smith told her on June 6 that Junior was being left to "bite the big ole bullet" unless she identified the other party involved. (*See* SCP Vol. 3, 365). As the Mississippi Supreme Court considered only the statements admitted at trial, Petitioner *had* already implicated herself and Gillis by the time the June 6 statement was made. Regardless of the court's failure to discuss the issue, it does not change this Court's conclusion as to the reasonableness of the decision reached on direct appeal. *See, e.g., Fields v. Thaler*, 558 F.3d 270, 279 (5th Cir. 2009)

Sheriff Smith immediately informed Petitioner that (1) she had a right to remain silent; (2) failure to exercise that right would result in what she said being used against her in court; (3) that an attorney would be appointed for her if she could not afford one; and (4) she had the right to stop the interview if she decided that she did not want to answer questions.  There is evidence that Junior had confessed his own involvement in a murder-for-hire scheme and implicated his mother's involvement prior to the initial interview with Petitioner.  Additionally, while Sheriff Smith did imply that it would benefit Petitioner if she cooperated, he did so at the point in the interview where she had already confessed that she had offered to pay someone to kill her husband.   The fact that Petitioner was confronted with facts evidencing her role in her husband's murder, and that it was her son who gave police that information, does not render questioning about the matter inherently coercive.  *See Colorado v. Connelly*, 479 U.S. 157, 169-70 (1986) (issue with voluntariness is coercion, not whether product of suspect's abstract free will).

Petitioner has failed to demonstrate that the statements given on June 4 and June 5 were involuntarily given, or that it was unreasonable to conclude that June 6 and 7 statements, which were in compliance with the mandates of *Miranda*, were properly admitted.   Therefore, the Court denies relief on this claim, and it will be dismissed.

## VI.  Ineffective Assistance of Counsel on Issue of Venue

Petitioner argues that her trial counsel rendered ineffective assistance of counsel in failing to file, document, and pursue a motion for a change of venue.  She states that although trial counsel believed that she could not receive a fair trial in Tishomingo County and thought they filed a motion to change venue, they did not.

On direct appeal, Petitioner presented a claim that the trial court erred in failing to grant a

motion for change of venue, but the Mississippi Supreme Court found no such motion in the record and rejected the claim. *See Byrom I*, 863 So.2d at 851. The court also noted that there was no evidence in the record that the failure to move the trial prejudiced her case. *Id.* On post-conviction review, Petitioner argued that trial counsel rendered ineffective assistance of counsel in failing to actively pursue a change of venue. *Byrom II*, 927 So.2d at 715. After reciting the evidence presented in support of the parties' positions, the court found "no justifiable reason necessitating a change of venue" in the case and rejected Petitioner's claim that counsel performed ineffectively in failing to secure one. *See id.* at 715-16. Petitioner argues that the finding that trial counsel was not ineffective and its finding that a change of venue was not necessary are contrary to and unreasonable applications of clearly established federal principles.

The Fourteenth Amendment's Due Process Clause safeguards a defendant's Sixth Amendment right to be tried by a panel of impartial jurors. *See, e.g., Irvin v. Dowd*, 366 U.S. 717, 722 (1961). A change of venue may be required and bias presumed when circumstances make it improbable that the accused will receive a fair trial in the county where the crime was committed. *Rideau v. Louisiana*, 373 U.S. 723 (1963). The *Rideau* principle of presumptive prejudice is rarely applicable and limited to those situations "where the petitioner can demonstrate an 'extreme situation' of inflammatory pretrial publicity that literally saturated the community in which his trial was held." *Mayola v. State of Alabama*, 623 F.2d 992, 997 (5th Cir. 1980).

There is no motion for a change of venue in the trial record, although defense counsel and the trial court both apparently thought that one had been made. The first record reference to a possible motion for a change of venue occurred at an omnibus hearing held in the case on June 22, 2000. (*See* SCP Vol. 1, 100). While the parties discussed the court's setting of deadlines in the

case, the prosecutor mentioned that he assumed that a motion for a change of venue would be filed in the case. (*See id.* at 117). He noted that he would attempt to try Petitioner's case first among the three defendants, and he would seek to try the case in Tishomingo County. (*See id.* at 119, 121).

The issue of venue was again addressed at a pretrial hearing on August 11, 2000, and both defense counsel Wood and the trial court believed that a motion for a change of venue had been filed at that time. (*See* SCP Vol. 10, 15, 20-21). The trial judge stated that he would reserve ruling on the motion until the case was ready for trial. (*See id.* at 20-21). At a hearing on October 18, 2000, defense counsel requested, in light of the fact that the request for change of venue had been denied, that the court take measures to shield the jury from outside information. (*Id.* at 111-12). The trial court granted the request and stated he would instruct the jury and the bailiffs concerning outside information. (*Id.* at 112-13).

As an exhibit to her petition for post-conviction review, Petitioner attached a total of seven newspaper articles in support of her claim that trial counsel rendered ineffective assistance in failing to make and pursue a motion to change venue. (*See* PCR Ex. 3). Petitioner has attached to her habeas petition three articles published in the *Tishomingo County News*, presumably in the months following Edward's murder. (*See* Pet. Ex. 10, 11, 12). Although the articles are undated, Petitioner maintains that they were published on June 10, 1999; July 15, 1999; and August 5, 1999, respectively. Two of the articles were presented to the State court for review, while the article presumably published on July 15, 1999, is presented for the first time here. Petitioner argues that this Court should presume that she was prejudiced by the media attention, as there was widespread publicity in the case.

Petitioner maintains that forty-four jurors responded when asked if anyone on the venire had any prior knowledge of the case, and Petitioner notes that two of her jurors, Shelia Cooley and Donna Durham, responded during voir dire that they had pretrial knowledge of the case. She also notes that juror Connie Lorealla Dexter's children played in the same baseball league as Petitioner's son. She notes that the defense did not exercise a challenge for cause against any of the women. Petitioner argues that this actual knowledge, when combined with the prejudicial publicity, would have required the trial judge to grant a motion to change the venue if trial counsel had appropriately made one. Finally, she notes that changes of venue were granted by the same judge to Petitioner's two co-defendants, both of whom ultimately pled guilty and received terms of incarceration.

A review of the transcript of the voir dire performed in this case shows that Juror Shelia Cooley responded that she had seen, heard, or read something about the case, but that she did not feel like she had any knowledge of what actually happened and could return a fair and proper verdict in the case. (*See* Trial Tr. Vol. 12, 370-71). Juror Donna Durham responded that she had "heard talk" about the case and read something in the paper, but that she did not think that she actually knew anything about what had happened as a result. (*Id.* at 375). She responded that she could listen to the evidence and weigh it to fairly decide what actually happened. (*Id.*). During voir dire, juror Connie Lorella Dexter indicated that her children and Petitioner's children played in the same summer league, but that their relationship was limited to "seeing them at the baseball field." (*Id.* at 361-62). She did not feel like that relationship would influence her in any way if she was chosen to be a juror. (*Id.* at 362).

Petitioner's jury was sequestered on the morning of November 14, 2001. (*See* Trial Tr.

Vol. 13, 505).  Prior to seating the jurors, the trial judge noted that there had been some news coverage of the case since he recessed court the previous evening.  (*See id.* at 508-09).  Although he had instructed the venire the previous evening not to watch, read, or listen to anything pertaining to the case, he asked the entire venire whether anyone had been exposed to the coverage.  (*See id.*).  No one responded.  (*Id.* at 509-10).

A claim of ineffective assistance of counsel is established if the defendant can show that counsel's performance fell below an objective standard of reasonableness in light of prevailing professional norms at the time, and that the defendant was prejudiced as a result.  *Strickland v. Washington*, 466 U.S. 668, 686-87 (1984).  In order to prevail upon her claim on habeas review, Petitioner's burden is not to show that she meets the *Strickland* standard, but rather, to show that the Mississippi Supreme Court's application of the standard was unreasonable.  *See Harrington v. Richter*, ___ U.S. ___, 131 S. Ct. 770, 788 (2011).

Pursuant to Mississippi law, a presumption arises that an impartial jury cannot be seated where the defendant files an application for a change of venue along with two credible affidavits stating that the defendant is unable to receive a fair trial in the county due to unfavorable public opinion.  *See Gray v. State*, 799 So.2d 53, 62 (Miss. 2001); Miss. Code Ann. § 99-15-35.  In the absence of such a presumption, Petitioner must show "an actual, identifiable prejudice on the part of members of the jury that is attributable to that publicity."  *Willie v. Maggio*, 737 F.2d 1372, 1386 (5th Cir. 1984)*; see also Skilling v. United States*, ___ S. Ct. ___, 130 S.Ct. 2896, 2912 (2010) (noting two-part inquiry to issue of whether pretrial publicity prejudiced defendant).

Petitioner has not presented the court with evidence that two such affiants were available, and she has also not demonstrated that the trial court should have required a change of venue

based upon any irrebuttable presumption of prejudice.  *See White v. State*, 495 So.2d 1346, 1349 (Miss. 1986).  Based upon the lack of an identifiable affiant who would have supported a motion for a change of venue, Petitioner failed to demonstrate that it was unreasonable to determine that counsel did not perform ineffectively in failing to file, pursue, and secure a change of venue in this case.  *See Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000) (holding petitioner's failure to show motion to change venue would have been granted by trial court defeats claim of prejudice).

The Court otherwise notes that the newspaper articles attached to the petition in this case were published more than a year prior to Petitioner's trial.  With the exception of one article, the additional articles presented to the Mississippi Supreme Court were all published while Petitioner's jury was sequestered and shielded from media information.  The sole article presented to the court that was published contemporaneous with trial was published on the morning of November 14, 2000.  The trial court instructed the jury on November 13, 2000, not to read or listen to any  information about the case, and no member of the venire responded that he or she had done so when questioned the next morning. On the morning of November 14, the jury was sequestered.  Additionally, during challenges for cause, defense counsel Wood stated that "there were quite a number" of juror questionnaires returned where the individual denied any knowledge whatsoever of the case.  (*See* Trial Tr. Vol. 13, 495).  The jurors that were seated denied any partiality and expressed their ability to remain impartial.  Jurors need not be completely unaware of the facts and circumstances of the crime; it is enough that they can set aside any opinion and render a verdict based upon the evidence presented at trial.  *Murray v. Florida*, 421 U.S. 784, 798-800 (1978).  Moreover, the fact that the trial judge granted venue changes to Gillis and Junior's cases has no bearing on this one, as Petitioner's case went to trial first.  Petitioner has failed to

demonstrate that the decision of the Mississippi Supreme Court was based upon an unreasonable application of law or determination of facts, and it will be dismissed.

## VII. Defective Indictment

Petitioner claims that the indictment handed down against her in this case was defective in six different ways. She maintains that the indictment (1) contained vague and ambiguous factors that failed to provide her adequate notice of the charges she had to defend against; (2) failed to identify any co-conspirators; (3) failed to set forth a definite written statement of the essential facts constituting the charged offense; (4) added additional language to the language contained in the statute; (5) inaccurately charged under the statute as someone who had "been offered or received" something of value; and (6) alleged all actions she took occurred on June 4, 1999, which requires all evidence of a conspiracy that took place prior to that date be excluded.

Petitioner presented the last five of these arguments to the Mississippi Supreme Court on direct appeal. *See Byrom I*, 863 So.2d at 864-65. The court noted that Petitioner was indicted under Miss. Code Ann. § 97-3-19(2)(d), which provides that an unlawful murder perpetrated by a person "who has been offered or has received anything of value for committing the murder, and all parties to such a murder, are guilty as principals" of capital murder. *Id.* The court cited previous holdings in support of its view that an indictment is sufficient provided that it clearly states or describes the nature of the crime charged and contains sufficient facts to put the defendant on notice of the accusation made against him or her. *See id.* at 866-67. The court found that if there was any error in the indictment's language, it was harmless beyond a reasonable doubt. *Id.* at 868. Finding that the indictment against Petitioner allowed her to prepare her defense and otherwise contained the factors required by Uniform Rules of Circuit and County

Court Practice ("URCCC") 7.06, it rejected Petitioner's claim.[35] *See id.*

On post-conviction review, the court rejected Petitioner's argument that the indictment was fatally defective because the aggravating factors were not contained in the indictment, finding the law "unequivocal" that such was not required for a charge of capital murder. *Byrom II*, 927 So.2d at 725-26.

> The Court first notes that the indictment, in pertinent part, reads that Petitioner:
>
> in said County and State on the 4th day of June, A.D., 1999, did wilfully, unlawfully, and feloniously kill or cause the death of Edward Louis Byrom, a human being, with deliberate design and without authority of law, after having been offered or having received something of value for committing the murder or was a party to such offer or receipt of anything of value or participated in any way in the murder of Edward Louis Byrom, in violation of Mississippi Code, Annotated, Section 97-3-19(2)(d); contrary to the form of the statute in such cases made and provided, and against the peace and dignity of the state of Mississippi.

(SCP Vol. 1, 11). The statute under which Petitioner was indicted provides:

> The killing of a human being without the authority of law by any means or in any manner shall be capital murder. . . . [when it is] [m]urder which is perpetrated by any person who has been offered or has received anything of value for committing the murder, and all parties to such a murder, are guilty as principals.

Miss. Code Ann. § 97-3-19(2)(d).

The United States Supreme Court has never held that the indictment provisions of the Fifth Amendment apply to the States through the Fourteenth Amendment. *See, e.g., Branzburg v.*

---

[35] Those factors include: (1) the name of the accused; (2) the date on which the indictment was filed in court; (3) a statement that the prosecution is brought in the name and by the authority of the State of Mississippi; (4) the county and judicial district in which the indictment is brought; (5) the date and, if applicable, the time at which the offense was alleged to have been committed. Failure to state the correct date shall not render the indictment insufficient; (6) the signature of the foreman of the grand jury issuing it; and (7) the words "against the peace and dignity of the state." *Id.* at 865 (*citing Gray v. State*, 728 So.2d 36, 70 (Miss. 1998)).

*Hayes*, 408 U.S. 665, 686-88 n.25 (1972) (noting that "indictment by grand jury is not part of the due process of law guaranteed to state criminal defendants by the Fourteenth Amendment"); *see also Apprendi v. New Jersey*, 530 U.S. 466, 477 n.3 (2000). Because of the deference afforded to a state's determination of its own law, a federal habeas court cannot review the sufficiency of a state indictment unless the petitioner can demonstrate that the indictment was so flawed that the trial court had no jurisdiction. *See, e.g., Evans v. Cain*, 577 F.3d 620, 624 (5th Cir. 2009). Where the state court has been presented the question of the indictment's sufficiency on appeal and ruled that the indictment was not fundamentally defective, federal habeas review of the issue is foreclosed. *See, e.g., Wood v. Quarterman*, 503 F.3d 408, 412 (5th Cir. 2007). The Mississippi Supreme Court found the indictment against Petitioner sufficient under State law, and the Court finds the issue of the indictment's sufficiency a matter improper for its review.

Even if the Court were to fully consider this claim, Petitioner would not be entitled to habeas relief under the standards of the AEDPA. The Supreme Court has held that an indictment is sufficient if it adequately informs the accused of the accusation against him so that he is able to prepare his defense and protects him against double jeopardy. *United States v. Debrow*, 346 U.S. 374 (1953). Mississippi law does not require aggravating circumstances to be included in the indictment. *See, e.g., Havard v. State*, 928 So.2d 771, 800 (Miss. 2006) (holding that the underlying crime elevating to capital murder must be identified with specific section and subsection of the statute). The aggravating circumstances upon which the State could rely in seeking the death penalty are limited to those enumerated in the statute, such that the indictment of capital murder itself put her on notice as to those aggravators that could be used against her at trial. Petitioner has failed to demonstrate an entitlement to relief on this issue, and it will be

dismissed.

## VIII. Trial Court's Failure to Consider All Relevant Mitigating Evidence

Petitioner maintains that, despite the wealth of mitigating evidence presented to the trial court for its consideration, the trial judge only considered two mitigating circumstances in his sentencing decision. She argues that the Mississippi Supreme Court erred in finding that the trial court considered all of the mitigating evidence before sentencing her to death, and that it erred in failing to apply the well-established law governing a court's consideration of mitigating evidence.

Shortly before trial, defense counsel filed a notice of mitigators that would be introduced in the sentencing phase of trial. (*See* SCP Vol. 3, 443-45). These included (1) Petitioner's lack of a significant criminal history; (2) that Petitioner was "under the influence of extreme mental or emotional disturbance" at the time of the crime; (3) that she was merely an accomplice in the crime with a relatively minor role; (4) that she "acted under extreme duress or under the substantial domination of another" at the time of the crime; (5) that her capacity "to appreciate the criminality of [her] conduct or to conform [her] conduct to the requirements of the law was substantially impaired"; and (6) that "other mitigating factors relevant to [Petitioner]'s life and background" would be presented. (*See id.*). At the sentencing phase of trial, which began the morning of November 18, 2000, no witnesses were called by either the State or the defense. (*See, e.g.*, Trial Tr. Vol. 16, 1001-06). The State moved to introduce all of the evidence presented at the guilt phase of trial, and it offered into evidence Dr. Lott's psychiatric report of Petitioner. (*See id.* at 1005). The defense moved to introduce all of the evidence presented in the guilt phase of trial, and it additionally offered Dr. Caruso's report of his psychiatric evaluation of Petitioner, along with Dr. Kitchen's medical history of Petitioner. (*See id.* at 1006; Def. Trial Ex. 89, 90).

The trial judge stated that he had not previously seen the reports offered by defense counsel, and he paused the proceedings for an unknown length of time to review them. (Trial Tr. Vol. 16, 1006-07).

Included in Dr. Caruso's report are four statutory and four non-statutory mitigating factors Dr. Caruso found relevant in determining the appropriate sentence for Petitioner. (*See* Reply Ex. 6). The statutory mitigators he found include that Petitioner (1) "had no significant history of prior criminal activity;" (2) committed the offense while "under the influence of extreme mental or emotional disturbance in response to the victim's history of abusing her and her son;" (3) engaged in actions that were provoked by "ongoing abuse" by the victim "that appeared to be escalating in severity;" and (4) Petitioner's capacity "to appreciate the criminality of her conduct or to conform her conduct to the requirements of the law was substantially impaired by her Major Depression, Dysthymic Disorder, Alcohol Dependence, Alcohol Intoxication, and Borderline Personality Disorder." (*Id*., Ex. B, 3). Included as non-statutory mitigating factors in the report are that (1) Petitioner's history of abuse was severe enough to cause her to develop Borderline Personality Disorder and Munchausen's syndrome; (2) Petitioner's "history of abuse modeled violence as problem solving;" (3) Petitioner's "history of abuse left her prone to strike out violently at abusive men;" and that (4) Petitioner "suffers from significant disabling medical problems." (*Id*.).

After the State presented the first part of its closing argument in support of a determination that Petitioner should receive the death penalty, defense counsel Phillips argued for the defense. She highlighted for the court some of the mitigating information contained in the reports of Drs. Caruso, Kitchens and Lott, none of which were introduced in the guilt phase of trial. (*See* Trial

Tr. Vol. 16, 1013).  Counsel argued that Petitioner's abusive childhood was relived through her relationship with Edward, who inflicted emotional, sexual, and physical abuse upon both Petitioner and Junior.  (*See id.* at 1013-14).  She maintained that Petitioner was unable to leave Edward, as he had threatened her life if she did, and she noted that Junior had testified that the violence in the home began to escalate in the months before Edward's death.  (*Id.* at 1015-16).  Citing Petitioner's medical difficulties, she noted that Edward's response to Petitioner's sickness was to become angry at Petitioner.  (*Id.* at 1017).  She also noted that the abuse in the home was so prevalent and unbearable that Petitioner ate rat poison in order to be admitted to the hospital and escape it.  (*Id.*).  Counsel argued that there had been no testimony to show that Petitioner was aware of the amount of Edward's life insurance, nor was there any testimony that the family was experiencing financial difficulty.  (*Id*. at 1018).  Finally, she maintained that Petitioner had not been shown to be anything other than a model prisoner, and that sparing her life would allow both Junior and Petitioner to keep the only support the other had.  (*Id.* at 1018-19).

In its final closing for the State, the prosecution argued that Petitioner had manipulated the doctors in the case, and it noted that the information in their reports had no corroboration.  (*Id.* at 1019-20).  The prosecution asked the court to impose a sentence of death.  (*Id.* at 1020-22).

After recessing to consider the arguments and evidence, the trial judge called court to order and delivered his findings.  The trial court found that Petitioner's mental state was culpable, and that Edward's murder was committed for pecuniary gain.  (*See id.* at 1022-23).  The court then stated:

> The Court, likewise, considered the mitigating factors, specifically, that the defendant had no prior criminal record of any kind, so far as the record indicates. And, further, the Court has considered the assertion that the defendant was acting while under the influence of some extreme mental or emotional disturbance.

66

> Parenthetically, the Court would observe that these factors are the only factors
> suggested which would appear and bear consideration by the Court.

(*Id.* at 1023-24). The court found that the mitigating factors considered by the court did not

outweigh the aggravating circumstance and that Petitioner should suffer death. (*Id.* at 1024).

On direct appeal, the Mississippi Supreme Court rejected Petitioner's claim that the trial

judge failed to properly consider the mitigating factors, finding that the record showed that the

trial court "clearly *considered* all the mitigating circumstances" and appropriately weighed them

with the aggravating factor. *Byrom I*, 863 So.2d. at 882.[36]

The United States Supreme Court has determined that, in order to ensure that death

sentences take into account the individual characteristics of each defendant and the circumstances

of the offense, the sentencer may not be prevented from considering any relevant statutory and

nonstatutory mitigating evidence that the defendant offers to support a lesser sentence. *See*

*Hitchock v. Dugger*, 481 U.S. 393, 398 (1987); *Eddings v. Oklahoma*, 455 U.S. 104, 112-15

(1982); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978). Petitioner maintains that the trial court's

refusal to consider the mitigating factors offered at sentencing violate these principles and demand

that her death sentence be vacated.

In *Lockett*, *Eddings*, and *Hitchcock*, however, the sentencer was precluded by law from

considering the proffered mitigating evidence. *See, e.g., Eddings*, 455 U.S. at 113 (trial judge

refused to consider mitigating factors as a matter of law); *Hitchcock*, 481 U.S. at 398 (jury

instructed to consider the factors enumerated in the statute); *Lockett*, 438 U.S. at 608 (statute

---

[36] Justice McRae dissented, finding that the judge's statement that only the first two
factors appeared to bear consideration suggested that he "failed to fully consider and give
appropriate weight" to all of the factors presented. *See id.* at 900-01.

limited the consideration of mitigating circumstances).  In this case, Petitioner was permitted to present mitigating evidence to the trial court, and there is no indication that the trial judge thought that his ability to consider or give weight to the evidence was impaired.  *See Abdul-Kabir v. Quarterman*, 550 U.S. 233, 264-65 (2007) (noting that the "cases following *Lockett* have made clear that when the jury is not permitted to give meaningful effect or a 'reasoned moral response' to a defendant's mitigating evidence - because it is forbidden from doing so by statute or a judicial interpretation of a statute - the sentencing process is fatally flawed.").

The sentencing order in this case provides that the trial court "considered each of the mitigating factors suggested by the Defendant and all other mitigating circumstances concerning the Defendant's character and history and the circumstance of the offense which might be considered mitigating on behalf of the Defendant." (SCP Vol. 4, 575).  The fact that the trial judge only found two of the factors to be actually mitigating does not warrant relief and does not render the decision that he considered all of the evidence unreasonable.  Even if the trial judge believed the facts as stated by Petitioner to be true, he was not required to find the factors presented by Petitioner to be mitigating or to give it any particular mitigating weight.  *See, e.g., United States v. Jackson*, 549 F.3d 963, 983 (5ᵗʰ Cir. 2008); *see also Eddings*, 455 U.S. at 114-15 (finding that the sentencer is entitled to determine the weight to be given to the evidence).  Therefore, Petitioner has failed to demonstrate that the decision of the Mississippi Supreme Court is based upon an unreasonable application of law or fact, and this claim will be dismissed.

## IX.  Counsel's Incompetent Advice to Waive Jury Sentencing

Petitioner concedes that she has never presented the State court with a claim that trial counsel performed ineffectively in advising her regarding the waiver of jury sentencing.  She

maintains, however, that counsel's incompetent advice to waive jury sentencing invalidated her waiver. She notes that the affidavits of defense counsel Terry Wood and Sunny Phillips establish that they encouraged her to waive jury sentencing based on their belief that the waiver might constitute reversible error. (*See* Pet. Ex. 5, 6). She also notes that she submitted an affidavit in State court stating that she did not comprehend what was occurring at sentencing. (PCR Ex. 5).

Prior to the sentencing hearing on November 18, 2000, the trial court stated that Petitioner indicated that she intended to execute a waiver of her right to jury sentencing. (Trial Tr. Vol. 16, 1001). After the trial court questioned her and she spoke briefly with her attorneys, Petitioner, all counsel, and the trial judge signed the waiver. (*See id.* at 1001-02). The court then asked Petitioner whether she understood that she had been convicted of capital murder and that the same jury had returned so that a sentencing hearing could be conducted. (*Id.* at 1002). Petitioner stated that she understood. (*Id.*). The trial judge then advised her:

> [Y]ou do have the right, under the law of this state, to have the jury, in this instance, the jury that actually heard the trial of the first phase or guilt phase of the trial, hear evidence which you and the State might put on for their consideration by way of aggravating and/or mitigating circumstances, as well as all of the proof that they have heard up until now; and that upon proper instruction, to consider whether or not that jury would impose the death penalty, life imprisonment without consideration for parole, or life imprisonment with consideration for parole. Do you understand that?
> DEFENDANT BYROM: Yes, sir.
> THE COURT: Do you understand that in the jury considering those various items, they would have to find unanimously, beyond a reasonable doubt, the existence of those aggravating circumstances which the Court would permit them to consider, that I would pass on those, first of all, but that they would have to find that the aggravating circumstances existed, as I stated, unanimously and beyond a reasonable doubt? Do you understand that?
> DEFENDANT BYROM: Yes, sir.
> THE COURT: And that if they did not find any of those to exist, they could not return a verdict which imposed the death penalty. Do you understand that?
> DEFENDANT BYROM: Yes, sir.
> THE COURT: Do you further understand that as to any mitigating circumstances

which might be introduced by your attorneys on your behalf during that phase of the trial, the jury need not be satisfied either unanimously or beyond a reasonable doubt to the existence of any of the mitigating factors before they could be considered by members of the jury? Do you understand that?

DEFENDANT BYROM: Yes, sir.

THE COURT: And that in making any decision that they might make, they would be required, under the instructions of this Court, to weigh relatively the aggravating circumstances as opposed to the mitigating circumstances which they found to exist, and that they would be required to find that the mitigating circumstances did not outweigh the aggravating circumstances before they could return a verdict which included imposition of the death penalty. Do you understand that?

DEFENDANT BYROM: Yes, sir.

THE COURT: Do you understand that in making my determination, I will be required to, in effect, do the same balancing test and to consider the same facts, circumstances, aggravating, and mitigating circumstances as a jury would do; but that it would be solely within my discretion to consider those and to find whatever I might determine to be appropriate in this case? Do you understand that?

DEFENDANT BYROM: I understand.

THE COURT: And, with that understanding, do you agree that this matter will be decided by me solely, without a jury?

DEFENDANT BYROM: Yes, sir.

THE COURT: Ms. Byrom, do you feel that you have had the benefit of a complete and adequate discussion with your attorneys concerning the waiver of your right to be tried, or at least to have the jury consider what sentence would be imposed in this case?

DEFENDANT BYROM: Yes, sir.

THE COURT: Any question in your mind about that?

DEFENDANT BYROM: No.

THE COURT: All right. The Court finds that the defendant, along with her attorneys and the State of Mississippi, have, in writing, waived the trial of phase two or the sentencing phase of this trial before a jury and agreed with thorough understanding and appreciation of the importance of this that I will hear and determine the sentence to be imposed in this case.

(Trial Tr. Vol. 16, 1002-1005). The court also noted that Petitioner's attorneys submitted a

certificate certifying that they had carefully and fully advised Petitioner of the penalties she faced,

and that, in their opinion, she was fully competent to understand and appreciate what was

transpiring. (*Id.* at 1005–06).

On direct appeal, Petitioner did not argue that the trial court could not properly sentence

her to death, but only that improper consideration was given to the evidence by the court.  *See Byrom I*, 863 So.2d 836, 881-82.[37]  On post-conviction review, Petitioner argued that the trial judge improperly sentenced her to death, as the capital sentencing statute does not permit a waiver of a jury for sentencing purposes.  *Byrom II*, 927 So.2d at 722-23.  Noting that the issue was barred for counsel's failure to raise it on direct appeal, the court nonetheless addressed the merits and found that the statutory requirement of jury sentencing could be waived upon a determination that the waiver was knowingly and intelligently made.  *Id.* at 722.  The court rejected her argument that the waiver was not knowingly and intelligently made.  *Id.* at 722-24.[38]

Petitioner argues that the Court must consider her claim, as a waiver based upon the incompetent advice of counsel is not valid.  However, Petitioner's claim that her waiver of jury sentencing is invalid because of counsel's incompetent advice was not presented on direct appeal or upon post-conviction review.  *See Wilder v. Cockrell*, 274 F.3d 255, 259 (5th Cir. 2001) ("[W]here petitioner advances in federal court an argument based on a legal theory distinct from that relied upon in the state court, he fails to satisfy the exhaustion requirement."); *see also Edwards v. Carpenter*, 529 U.S. 446, 451-53 (2000) (claim of ineffective assistance must itself be exhausted before it may be used as cause to excuse procedural defect ).  Petitioner has not shown cause for her failure to present this claim to the State court for review, and it is barred from the Court's consideration.

---

[37] In a dissenting opinion, Justice McRae noted that he did not believe that a jury properly advised of all the evidence would have sentenced her to death and that the trial judge erred in sentencing her to death.  *See id.* at 893, 899-900.

[38] The Mississippi Supreme Court engaged in a lengthy analysis of whether she was accurately informed of the trial court's sentencing options, which is not an issue on habeas review under this claim.  *See id.* at 724-25.

Even though it is not a distinct issue raised on habeas, the Court, out of an abundance of caution, otherwise finds that whether the trial court could properly sentence Petitioner is a matter of State law not cognizable on federal habeas review. *See, e.g., Whalen v. United States*, 445 U.S. 684, 687-88 (1980) (noting that federal courts lack jurisdiction to interpret state legislation); *Garner v. Louisiana*, 368 U.S. 157, 169 (1961) (holding that state courts have final interpretative authority of own laws); *see also Bishop v. Epps*, 265 Fed.Appx. 285, 294 (5th Cir. 2008) (unpublished) (denying COA on claim that petitioner did not have right to waive jury sentencing). To the extent Petitioner's claim is not barred, the Court finds that Petitioner has not demonstrated that the Mississippi Supreme Court's decision was unreasonable in its application of law. Petitioner's attorneys certified to the trial court that she was competent to make the decision to waive jury sentencing, and the trial court's questioning of Petitioner leaves no doubt that she was informed of what right she was abandoning. Moreover, Petitioner's own affidavit, which she cites in support of this claim, states that she believed that the judge would be more lenient to her than the jury. (*See* PCR Ex. 5 ¶ 46). This claim will be dismissed.

## X. Ineffective Assistance of Counsel in Presenting Mitigating Evidence

Petitioner maintains that trial counsel rendered ineffective assistance in prematurely abandoning their investigation of possible mitigating evidence and in failing to present any witnesses at the sentencing phase of trial, despite the fact that numerous witnesses could have testified as to the physical and sexual abuse Petitioner had allegedly endured at the hands of both her stepfather and her husband. While trial counsel did present the medical reports of Dr. Kitchens and Dr. Caruso, Petitioner argues that additional witnesses could have confronted the State's argument that the neither her doctors nor Dr. Lott's report corroborated the information

she had given them.  (*See, e.g.,* Trial Tr. Vol. 16, 1006, 1020; Trial Ex. 88, 89, 90).  Dr. Caruso's report of his pretrial evaluation of Petitioner describes her extensive history of physical, emotional, and sexual abuse as a child, as well as a long history of sexual, emotional and physical abuse inflicted by Edward.  (Reply Ex. 6).  His diagnostic impressions were that she suffered from Borderline Personality Disorder, depression, alcohol dependence, and Factious Disorder. (*See id.*).  However, Petitioner's attorneys did not provide Dr. Caruso with information from collateral sources.  Petitioner notes that defense counsel argued in closing argument that Petitioner's actions were that of an extremely scarred and troubled woman who was afraid to leave her husband, and in response, the State argued that the reports had no corroboration.  (*See* Trial Tr. Vol. 16, 1013-16, 1020).

Petitioner argues that numerous family members were available to corroborate the information contained in Dr. Caruso's report.  She presented the State court with affidavits from her brothers, Kenneth and Louis Dimitro; her mother, Betty Postalwart; her sister-in-law, Doranna Dimitro; her niece, Leighanne Bundy; and her sister, Helen Garnett.  (*See* PCR Ex. 4, 6, 7, 8, 17, 18).  These affidavits affirm Petitioner's contention that she grew up with a stepfather who was both verbally and physically abusive to the children and their mother.  (*See id.*).  They note that Petitioner became withdrawn shortly after her mother married her stepfather, and that after she ran away from home at the age of fifteen, Petitioner confided to her brother that their stepfather had been sexually abusing her.  (*See* PCR Ex. 4, Aff. of Kenneth Dimitro).  She maintains that these witnesses could have also testified that Petitioner was the victim of Edward's physical abuse, the results of which she tried to hide from friends and family.  (*See, e.g.*, PCR Ex. 8, Aff. of Louis Dimitro; PCR Ex. 7, Aff. of Doranna Dimitro; PCR Ex. 17, Aff. of Leighanne Bundy).

Petitioner's sister, Helen Marie Garnett, attests that she could have told the jury that Edward once sexually assaulted Garnett at the Byrom home while Petitioner was in the shower. (*See* PCR Ex. 18, Aff. of Helen Garnett). Petitioner notes that the family could have testified that Edward was a drunk who was particularly controlling and abusive when he consumed alcohol. (*See, e.g.*, PCR Ex. 17; Reply Ex. 7, Decl. of Louis Dimitro; Reply Ex. 8, Decl. of Kenneth Dimitro). Additionally, she argues, Dr. Caruso could have explained that Petitioner's emotional and mental disorders are entirely consistent of someone with a background of extreme abuse, and he could have given an explanation as to why it is difficult for such women to leave an abusive spouse. (*See* Reply Ex. 6).

Petitioner maintains that instead of offering this evidence, trial counsel determined that it was better strategy not to present witnesses in mitigation so that the state would be unaware of the mitigation testimony to be offered at the retrial, which they were certain would occur. (*See* Pet. Ex. 6, Aff. of Terry Wood; Pet. Ex. 7, Aff. of Sunny Phillips; Pet. Ex. 15). She notes that Dr. Caruso states that he believed that he was going to testify in the case, and that he was present the day that the sentencing hearing began. (*See* Reply Ex. 6). She maintains that the evidentiary picture would have been dramatically different from the one actually presented if Dr. Caruso and Byrom's family members had testified.

Petitioner presented a claim that counsel rendered ineffective assistance at the sentencing phase on post-conviction review, and while it found defense counsel's failure to call any witnesses "admittedly perplexing" and their explanation as to why unhelpful, the Mississippi Supreme Court nonetheless denied relief on the claim. *Byrom II*, 927 So.2d at 717-21. The court noted that "[t]he gist of the family members' testimony from the affidavits was that [Petitioner] was a good person

who had lived a difficult life and that whatever she did was because she was sick and in a terrible situation." *Id*. at 721. The court found that the doctors' reports that were considered by the trial court contained the information that Petitioner states her family members could have offered, and that it is speculative whether hearing the live witnesses give information already known to the court would have been persuasive. *Id*.[39]

Respondents maintain that the affidavits presented to the State court contain mostly hearsay statements and speculation about what the individuals believe happened based solely on what Petitioner had confided to them in the past. (*See, e.g.,* PCR Ex. 4, 6, 7, 8, 18).[40] They also maintain that the affidavits demonstrate that, contrary to Petitioner's assertions, the attorneys did communicate with Petitioner's family members. (*See, e.g.,* PCR Ex. 7, 8, 17, 18; Pet. Ex. 5, 6). Respondents argue that, in light of the evidence introduced by counsel at the sentencing phase of trial, the admissible portions of these affidavits do not create a reasonable probability that Petitioner would have received a different sentence if the additional information had been introduced.

Initially, the Court considers Petitioner's claim that the Mississippi Supreme Court

---

[39] In a dissent by Justice Dickinson that was joined in part by Justices Graves and Cobb, Justice Dickinson noted the "overwhelming" mitigating circumstances in this case, combined with counsel's choice to waive jury sentencing, resulted in the ineffective assistance of counsel. *See id.* at 732. (Dickinson, J., dissenting, joined in part by Cobb, P.J. and Graves, J.). He further stated that he was unable "to conjure up . . . a more egregious case of ineffective assistance of counsel during the sentencing phase of a capital case." *Id.*

[40] Respondents also argue that all of the affidavits filed by Petitioner's family members were signed and sworn to in Tennessee or Michigan before a Mississippi Notary and otherwise do not comply with the statutory requirements. *See, e.g.*, Miss. Code Ann. § 99-39-9(1)(e). The Court notes that the supplemental declarations filed by Louis and Kenneth Dimitro in these proceedings are not notarized. (*See, e.g.*, Reply Ex. 7, 8). For purposes of simplicity, the Court refers to all of the statements as "affidavits."

unreasonably applied the principles of *Strickland* in assuming the trial counsel's investigation of potential mitigation evidence was adequate. Petitioner primarily relies upon the Supreme Court's decisions in *Williams v. Taylor*, 529 U.S. 362 (2000), *Wiggins v. Smith*, 539 U.S. 510 (2003) and *Rompilla v. Beard*, 545 U.S. 374 (2005) to support her claim that "some investigation" is not sufficient to establish that counsel has performed an adequate investigation in light of prevailing professional norms. She argues that the information contained in Dr. Caruso's resort would have alerted any reasonably competent attorney to investigate further. This is particularly true, she maintains, when the potentially mitigating evidence includes mental health problems or a difficult or impoverished childhood.

The Court, however, finds that it is not unreasonable to conclude that counsel adequately investigated Petitioner's background. In early October, 2000, defense counsel sought and obtained an order compelling the trial attendance of five out-of-state witnesses, as well as an order allowing for the costs associated with their attendance at trial. (*See* SCP Vol. 2, 168-73). On October 17, 2000, defense counsel tendered a witness list to the State that identified nine defense witnesses for trial. (SCP Vol. 2, 235). The anticipated witness list was mostly comprised of out-of-state family members who could confirm the history of abuse in the family. (*See* Trial Tr. Vol. 10, 32-35). At a hearing on October 18, 2000, defense counsel Wood stated that he did not provide the prosecution with a definite conclusion about their testimonies because the information learned was primarily that Petitioner and Junior were abused by Edward, and that there was "just not a lot to tell" from the "fairly generic" information obtained. (*See id.* at 34). He otherwise informed the court that the family members did not have much contact, and that they did not know information relevant to the offense itself. (*See id.*). The trial court ordered defense counsel to provide the

prosecution with specific statements about the testimony to be offered by the witnesses at trial. (*See id.* at 35).

On October 20, 2000, defense counsel provided the prosecution with a summary of information obtained from eight witnesses the defense anticipated calling to give testimony in its case-in-chief. (*See* SCP Vol. 2, 271-73). Included in the witness list were Petitioner's niece, Leighanne Garnett; her brother, Louis Dimitro; and her sisters, Renee Copeland and Helen Garnett. (*See id.*). The letter recounts their knowledge of the physical and sexual abuse in the Byrom home, as well as their perceptions of Petitioner's despondency and hopelessness. (*See id.*). These family members were in Iuka for Petitioner's trial, as the trial court authorized hotel and meal allowances for them. (*See, e.g.*, SCP Vol. 5, 652-669). Additionally, Petitioner's brother, Kenneth Dimitro, and her sister-in-law, Doranna Dimitro, were present in Iuka for trial. (*See* PCR Ex. 4; PCR Ex. 7). Dr. Caruso, the psychiatric expert obtained by the defense, was also present to testify at trial and was prepared to testify at the sentencing phase. (*See* SCP Vol. 5, 623; Reply Ex. 6).

The affidavit of Petitioner's mother, Betty Postalwait, states that she did not attend trial and was not contacted by her daughter's attorneys. (*See* PCR Ex. 6). However, the Court notes that Ms. Postalwait lived with Louis and Doranna Dimitro, who were present in Iuka at the time of trial, and that Louis' affidavit references his correspondence with Petitioner's attorneys prior to trial. (*See id.*; PCR Ex. 7,8). The affidavits also reference the family's communication with the attorneys during trial, such as Doranna Dimitro's statement that defense counsel Phillips told the family to stay at the hotel rather than attend trial and not to buy a newspaper. (*See, e.g.,* PCR Ex. 7). After compelling the family's attendance in Mississippi for trial, it is most reasonable to conclude that defense counsel wanted to keep the family from the trial in order to preserve them as

77

potential witnesses. Petitioner's attorneys took steps to obtain information from her family members, compel their attendance at trial, and sought and obtained a psychiatric expert to provide assistance in the defense. The majority of the information Petitioner has presented in support of her assertion that counsel's investigation was unreasonably limited was in the knowledge of the people that were present for her trial. Therefore, the Court determines that Petitioner has not shown that it is unreasonable to conclude that counsel's investigation into potential mitigating circumstances was not ineffective.

However, the Court's conclusion regarding counsel's investigation does not determine whether it is unreasonable to conclude that counsel rendered effective assistance in the presentation of mitigating evidence. Petitioner argues that had the evidence presented to this Court been presented through live witness testimony at trial, the trial court would have had no legitimate basis for refusing to consider her history of abuse. She maintains that the evidence would have also supported the argument that Petitioner was attempting to escape an abusive marriage, thereby weakening the aggravating factor of pecuniary gain. Additionally, she argues that the court failed to evaluate the strength of the competing evidence in determining whether Petitioner would not have been sentenced to death if available mitigating evidence had been presented. Maintaining that a reasonable probability exists that she would not have been sentenced to death if this evidence had been presented, she argues that the Mississippi Supreme Court's conclusion on this issue is based upon an unreasonable application of governing law.

This Court has reviewed all of the statements given by Petitioner's friends and family members in this case, and it determines that Petitioner has failed to demonstrate that the Mississippi Supreme Court unreasonably applied the governing principles of *Strickland* and its

progeny to Petitioner's claim. *See, e.g., Richter*, 131 S. Ct. at 788 (holding that inquiry on habeas is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard"). Counsel's failure to present live mitigation testimony in this case was not the result of a limited investigation, but rather, a strategic decision. Counsel made this decision despite securing funds to hire a psychiatric expert, compelling the trial attendance of Petitioner's family members from Michigan and Alabama, and securing paid witness expenses for these individuals. The Court assumes, without deciding, that counsel's failure to call readily available witnesses at the sentencing phase of a capital murder trial in order to preserve the testimony for a hypothetical retrial is an unreasonable strategic decision. *See, e.g., Moore v. Johnson*, 194 F.3d 586, 615 (5th Cir. 1999) (holding that courts defer to strategic decisions intended to yield benefit or avoid harm where that decision is based on sound legal reasoning).

Despite the Court's assumption that counsel's performance was deficient, relief is not warranted on this claim as Petitioner has not demonstrated that it was unreasonable to conclude that Petitioner was not prejudiced by counsel's failure. *See, e.g., Moawad v. Anderson*, 143 F.3d 942, 946 (5th Cir. 1998) (holding that a claim that does not satisfy both prongs of *Strickland* must be rejected). Petitioner was not sentenced by a jury. She was sentenced by a trial judge who was aware throughout trial of Petitioner's allegations of physical and sexual abuse at Edward's hands. Prior to closing arguments at sentencing, the trial judge reviewed Petitioner's medical records, and he reviewed Dr. Caruso's detailed report chronicling Petitioner's background, her relationship with the victim, as well as her mental and medical impairments. (*See* Def. Trial Ex. 89, 90). Additionally, the judge reviewed Dr. Lott's report, which outlined many of the same details of abuse as noted in Dr. Caruso's report. (*See* State Trial Ex. 88). The information Petitioner claims

her family members could have offered add nothing particularly compelling to the information already before the trial court. *See Wong v. Belmontes*, ___ S. Ct. ___, 130 S.Ct. 383, 388 (2009) (finding no prejudice where new "humanizing evidence" was mostly cumulative of that presented at sentencing). As the omitted testimony "would barely have altered the sentencing profile presented to the sentencing judge," Petitioner has failed to demonstrate that it was unreasonable to conclude that she was not prejudiced by trial counsel's failure to present live mitigation testimony. *Strickland*, 466 U.S. at 700. This claim will be dismissed.

## XI. Cumulative Error

An accumulation of errors, which are individually harmless or otherwise non-reversible, may require reversal where they deny the defendant a fundamentally fair trial. *See, e.g.,United States v. Munoz*, 150 F.3d 401, 418 (5th Cir. 1998). The doctrine of cummulative error will allow habeas relief when errors of constitutional dimension have occurred, the matters are not procedurally barred, and the errors "so infected the entire trial that the resulting conviction violates due process." *Derden v. McNeel*, 978 F.3d 1453, 1454 (5th Cir. 1992). On both direct appeal and post-conviction review, Petitioner's asserted claims of cumulative error were rejected, with the court finding that any errors that did appear were harmless beyond a reasonable doubt and did not deprive Petitioner of a "fundamentally fair and impartial trial." *See Byrom I*, 863 So.2d at 846-47; *Byrom II*, 927 So.2d at 729-30. Petitioner has not demonstrated that her trial resulted in preserved errors of constitutional dimension that deprived her of a fair trial, and the Court will dismiss this claim.

## Certificate of Appealability

Under the AEDPA, Petitioner must obtain a certificate of appealability ("COA") before

appealing this Court's decision denying federal habeas relief. 28 U.S.C. § 2253(c)(1). A COA will not issue unless Petitioner makes "a substantial showing of the denial of a constitutional right" of any claim rejected on its merits, which Petitioner may do by demonstrating that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Where a petitioner's claim has been denied on procedural grounds, Petitioner must additionally demonstrate that "jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484. This Court must issue or deny a COA upon its entry of an order adverse to Petitioner. *See* Rule 11 of the Rules Governing § 2254 Cases. The Court, resolving in Petitioner's favor any doubt as to whether a COA should issue, determines that Petitioner is entitled to a COA on her claims that she is entitled to habeas relief based upon the Mississippi Supreme Court's resolution of her claims that (1) evidence was improperly suppressed; (2) her statements were taken in violation of her privilege against self-incrimination; (3) the trial court failed to consider all mitigating evidence; (4) her waiver of jury sentencing was invalid; and (5) counsel was ineffective in failing to investigate and present all available mitigating evidence. The Court determines that Petitioner has not demonstrated that reasonable jurists would debate its procedural and/or substantive rulings on the remaining claims raised by Petitioner. Therefore, a certificate of appealability will issue only on the previously designated claims.

## Conclusion

For the reasons set forth above, Petitioner has not demonstrated that the denial of her State petition was contrary to, or involved an unreasonable application of, clearly established federal law, nor has the denial been shown to have been based on an unreasonable determination of facts

in light of the evidence presented in the State court proceedings.  Accordingly, it is hereby

**ORDERED** that:

1.  All federal habeas corpus relief requested by Petitioner is **DENIED**, and the instant petition shall be **DISMISSED** with prejudice.

2.  Petitioner's request for an evidentiary hearing is **DENIED**.

3.  All pending motions are **DISMISSED** as moot.

4.  Petitioner is **GRANTED** a Certificate of Appealability on her claims that:  (1) evidence was improperly suppressed (Claim IV); (2) her statements were taken in violation of her privilege against self-incrimination (Claim V); (3) the trial court failed to consider all mitigating evidence (Claim VIII); (4) her waiver of jury sentencing was invalid (Claim IX); and (5) counsel was ineffective in failing to investigate and present all available mitigating evidence (Claim X).

5.  Petitioner is **DENIED** a Certificate of Appealability on all remaining claims raised in the petition.

      **SO ORDERED**, **THIS** the 22nd day of August, 2011.


      **/s/ MICHAEL P. MILLS**
      **CHIEF JUDGE**
      **UNITED STATES DISTRICT COURT**
      **NORTHERN DISTRICT OF MISSISSIPPI**